CARMICHAEL, ATTORNEY GENERAL OF ALABAMA, ET AL. *v.* SOUTHERN COAL & COKE CO.*

No. 724.  Argued April 7, 8, 1937.—Decided May 24, 1937.

*Together with No. 797, *Carmichael, Attorney General of Alabama, et al.* v. *Gulf States Paper Corp.*  Appeal from the District Court of the United States for the Middle District of Alabama.

*Messrs. A. A. Carmichael,* Attorney General of Alabama, and *Peyton D. Bibb,* Assistant Attorney General, with whom *Messrs. Charles L. Rowe* and *Thomas S. Lawson,* Assistant Attorneys General, and *Noel T. Downing* were on the brief, for appellants.

*Mr. Borden Burr,* with whom *Messrs. Niel P. Sterne* and *Marion Rushton* were on the brief, for Southern Coal & Coke Co., appellee in No. 724.

*Mr. Forney Johnston,* with whom *Mr. Jos. F. Johnston* was on the brief, for Gulf States Paper Corp., appellee in No. 797.

500

502

By leave of Court, *Attorney General Cummings, Solicitor General Reed, Assistant Attorney General Jackson,* and *Messrs. Charles E. Wyzanski, Jr., Sewall Key, A. H. Feller, Arnold Raum, F. A. LeSourd, Charles A. Horsky, Thomas H. Eliot,* and *Alanson Willcox* filed a brief on behalf of the United States, as *amicus curiae,* supporting the validity of the Acts.

By leave of Court, *Messrs. John S. Coleman* and *William B. White* filed a brief, as *amici curiae,* challenging the validity of the Acts.

MR. JUSTICE STONE delivered the opinion of the Court.

The questions for decision are whether the Unemployment Compensation Act of Alabama infringes the due

process and equal protection clauses of the Fourteenth Amendment, and whether it is invalid because its enactment was coerced by the action of the Federal government in adopting the Social Security Act, and because it involves an unconstitutional surrender to the national government of the sovereign power of the state.

Appellee, the Southern Coal & Coke Co., is a Delaware corporation employing more than eight persons in its business of coal mining in Alabama. Appellee, Gulf States Paper Corporation, is a Delaware corporation employing more than eight persons in its business of manufacturing paper within the state. They brought the present suits in the District Court for the Middle District of Alabama, to restrain appellants, the Attorney General and the Unemployment Compensation Commission of Alabama, from collecting the money contributions exacted of them by the provisions of the Alabama Unemployment Compensation Act. From the decrees of the district court, three judges sitting (Jud. Code, § 266, 28 U. S. C. § 380), granting the relief prayed, the case comes here on appeal. Jud. Code, § 238 (3), 28 U. S. C., § 345 (3).

The Unemployment Compensation Act, Ala. Acts 1935, No. 447; Ala. Code of 1928 (1936 Cum. Supp.) §§ 7597 (1) *et seq.*, as amended by Acts of 1936, Nos. 156, 194, 195, and Acts of Feb. 10, 1937, and March 1, 1937, Spec. Sess. 1937, sets up a comprehensive scheme for providing unemployment benefits for workers employed within the state by employers designated by the Act. These employers include all who employ eight or more persons for twenty or more weeks in the year, § 2 (f), except those engaged in certain specified employments.[1] It imposes

---

[1] See § 2 (g). "Employment" is defined to exclude:

(1) Agricultural labor;

(2) Domestic service in a private home;

(3) Service performed as an officer, bar pilot, or member of th crew of a vessel on the navigable waters of the United States;

on the employers the obligation to pay a certain percentage of their total monthly payrolls into the state Unemployment Compensation Fund, administered by appellants. For 1936 the levy is .9 of 1%; for 1937 it is 1.8% and for 1938 and subsequent years it is 2.7%. § 4 (b). In 1941 and thereafter the rates of contribution by employers are to be revised in accordance with experience, but in no case are they to be less than 1½ or more than 4% of the payroll. § 4 (c). After May 1, 1936, each employee is required to contribute 1% of his wages to the fund. § 4 (d). The fund is to be deposited in the "Unemployment Trust Fund" of the United States Government, § 3 (d), cf. Social Security Act, § 904 (a), and is to be used as requisitioned by the State Commission, to pay unemployment benefits prescribed by the statute, §§ 3 (b), 3 (d), but without any liability on the part of the state beyond amounts paid into or earned by the fund. Benefits are payable from the fund to the employees covered by the Act, in the event of their unem-

(4) Service performed by an individual in the employ of his son, daughter, or spouse, and service performed by a child under the age of twenty-one in the employ of his father or mother;

(5) Service performed in the employ of the United States Government or of an instrumentality of the United States;

(6) Service performed in the employ of a carrier engaged in interstate commerce and subject to the Act of Congress known as The Railway Labor Act; as amended or as hereafter amended. Service performed by those engaged as solicitors or agents for Insurance Companies;

(7) Service performed in the employ of a state, or political subdivision thereof, or an instrumentality of one or more states or political subdivisions;

(8) Service performed in the employ of a corporation, community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual.

ployment, upon prescribed conditions and at prescribed rates.

The Act satisfies the criteria which, by § 903 (a) of the Social Security Act of August 14, 1935, c. 531, 49 Stat. 620, 640, 42 U. S. C. § 1103 (a), are made prerequisite to its approval by the Social Security Board created by that Act, and it has been approved by the Board as that section directs. By § 902 of the Social Security Act, contributors to the state fund are entitled to credit their contributions in satisfaction of the tax imposed on employers by the Social Security Act, to the extent of 90% of the tax. See *Chas. C. Steward Machine Co.* v. *Davis,* decided this day, *post,* p. 548.

In the court below, the statute was assailed as repugnant to various provisions of the state constitution. These contentions have been put at rest by the decision of the Supreme Court of Alabama in *Beeland Wholesale Co.* v. *Kaufman,* 174 So. 516, holding the state act valid under both the state and federal constitutions. The statute was also attacked on the ground that the Social Security Act is invalid under the Federal Constitution, since the state act declares that it "shall become void" if the Supreme Court of the United States shall hold the Social Security Act invalid. The Alabama court interpreted the statute as having operative effect only if the Social Security Act were constitutional—even in advance of a decision by this Court. We need not decide whether the state court's ruling that the federal statute is valid is conclusive upon us for the purpose of determining whether the state law is presently in force, *Miller's Executors* v. *Swann,* 150 U. S. 132; *Louisville & Nashville R. Co.* v. *Western Union,* 237 U. S. 300, because its conclusion as to the validity of the federal act agrees with our own, announced in *Chas. C. Steward Machine Co.* v. *Davis, supra.*

Attacks were leveled at the statute on numerous other grounds, which are urged here,—as an infringement of

the due process and equal protection clauses of the Fourteenth Amendment, as an unconstitutional surrender to the United States government of the sovereign power of the state, and as a measure owing its passage to the coercive action of Congress in the enactment of the Social Security Act.

In *Beeland Wholesale Co.* v. *Kaufman, supra,* the Supreme Court of Alabama held that the contributions which the statute exacts of employers are excise taxes laid in conformity to the constitution and laws of the state. While the particular name which a state court or legislature may give to a money payment commanded by its statute is not controlling here when its constitutionality is in question, cf. *Educational Films Co.* v. *Ward,* 282 U. S. 379, 387; *Storaasli* v. *Minnesota,* 283 U. S. 57, 62; *Wagner* v. *Covington,* 251 U. S. 95, 102; *Standard Oil Co.* v. *Graves,* 249 U. S. 389, 394, we see no reason to doubt that the present statute is an exertion of the taxing power of the state. Cf. *Carley & Hamilton* v. *Snook,* 281 U. S. 66, 71.

Taxes, which are but the means of distributing the burden of the cost of government, are commonly levied on property or its use, but they may likewise be laid on the exercise of personal rights and privileges. As has been pointed out by the opinion in the *Chas. C. Steward Machine Co.* case, such levies, including taxes on the exercise of the right to employ or to be employed, were known in England and the Colonies before the adoption of the Constitution, and must be taken to be embraced within the wide range of choice of subjects of taxation, which was an attribute of the sovereign power of the states at the time of the adoption of the Constitution, and which was reserved to them by that instrument. As the present levy has all the indicia of a tax, and is of a type traditional in the history of Anglo-American legislation, it is within state taxing power, and it is immaterial whether it is

called an excise or by another name. See *Barwise* v. *Sheppard,* 299 U. S. 33, 36. Its validity under the Federal Constitution is to be determined in the light of constitutional principles applicable to state taxation.

Validity of the Tax Under the Fourteenth Amendment.

*First. Validity of the Tax* Qua *Tax.* It is inherent in the exercise of the power to tax that a state be free to select the subjects of taxation and to grant exemptions. Neither due process nor equal protection imposes upon a state any rigid rule of equality of taxation. See *Bell's Gap R. Co.* v. *Pennsylvania,* 134 U. S. 232, 237; *Lawrence* v. *State Tax Comm'n,* 286 U. S. 276, 284. This Court has repeatedly held that inequalities which result from a singling out of one particular class for taxation or exemption, infringe no constitutional limitation. *Magoun* v. *Illinois Trust & Savings Bank,* 170 U. S. 283, 293; *American Sugar Refining Co.* v. *Louisiana,* 179 U. S. 89, 94; *Armour Packing Co.* v. *Lacy,* 200 U. S. 226, 235; *Brown-Forman Co.* v. *Kentucky,* 217 U. S. 563, 573; *Quong Wing* v. *Kirkendall,* 223 U. S. 59, 62, 63; *Armour & Co.* v. *Virginia,* 246 U. S. 1, 6; *Alaska Fish Co.* v. *Smith,* 255 U. S. 44, 48; *State Board of Tax Comm'rs* v. *Jackson,* 283 U. S. 527, 537; *Broad River Power Co.* v. *Query,* 288 U. S. 178, 180; *Fox* v. *Standard Oil Co.,* 294 U. S. 87, 97; *Cincinnati Soap Co.* v. *United States, ante,* p. 308; *Great Atlantic & Pacific Tea Co.* v. *Grosjean, ante,* p. 412.

Like considerations govern exemptions from the operation of a tax imposed on the members of a class. A legislature is not bound to tax every member of a class or none. It may make distinctions of degree having a rational basis, and when subjected to judicial scrutiny they must be presumed to rest on that basis if there is any conceivable state of facts which would support it. *Rast* v. *Van Deman & Lewis Co.,* 240 U. S. 342, 357; *Heisler* v. *Thomas Colliery Co.,* 260 U. S. 245, 255; *Swiss Oil*

*Corp.* v. *Shanks,* 273 U. S. 407, 413; *Lawrence* v. *State Tax Comm'n, supra;* cf. *Metropolitan Casualty Insurance Co.* v. *Brownell,* 294 U. S. 580, 584.

This restriction upon the judicial function, in passing on the constitutionality of statutes, is not artificial or irrational. A state legislature, in the enactment of laws, has the widest possible latitude within the limits of the Constitution. In the nature of the case it cannot record a complete catalogue of the considerations which move its members to enact laws. In the absence of such a record courts cannot assume that its action is capricious, or that, with its informed acquaintance with local conditions to which the legislation is to be applied, it was not aware of facts which afford reasonable basis for its action. Only by faithful adherence to this guiding principle of judicial review of legislation is it possible to preserve to the legislative branch its rightful independence and its ability to function.

(a) Exclusion of Employers of Less than Eight. Distinctions in degree, stated in terms of differences in number, have often been the target of attack, see *Booth* v. *Indiana,* 237 U. S. 391, 397. It is argued here, and it was ruled by the court below, that there can be no reason for a distinction, for purposes of taxation, between those who have only seven employees and those who have eight. Yet, this is the type of distinction which the law is often called upon to make.[2] It is only a difference in numbers

---

[2] *St. Louis Consolidated Coal Co.* v. *Illinois,* 185 U. S. 203, 207 (coal mines employing five or more subject to inspection); *McLean* v. *Arkansas,* 211 U. S. 539, 551 (mines employing ten or more required to measure coal for payment of wages before screening); *Booth* v. *Indiana,* 237 U. S. 391, 397 (mines required to supply wash-houses upon demand of twenty employees); *Jeffrey Mfg. Co.* v. *Blagg,* 235 U. S. 571, 576; *Middleton* v. *Texas Power & L. Co.,* 249 U. S. 152, 159 (employers of five or more included within workmen's compensation act).

which marks the moment when day ends and night begins, when the disabilities of infancy terminate and the status of legal competency is assumed. It separates large incomes which are taxed from the smaller ones which are exempt, as it marks here the difference between the proprietors of larger businesses who are taxed and the proprietors of smaller businesses who are not.

Administrative convenience and expense in the collection or measurement of the tax are alone a sufficient justification for the difference between the treatment of small incomes or small taxpayers and that meted out to others. *Citizens' Telephone Co.* v. *Fuller,* 229 U. S. 322, 332; *Hatch* v. *Reardon,* 204 U. S. 152, 159; *New York* v. *Latrobe,* 279 U. S. 421, 428; *Aero Transit Co.* v. *Georgia Public Service Comm'n,* 295 U. S. 285, 289. Cf. *Florida Central & Peninsular R. Co.* v. *Reynolds,* 183 U. S. 471, 480; *Packer Corp.* v. *Utah,* 285 U. S. 105, 110, footnote 6. We cannot say that the expense and inconvenience of collecting the tax from small employers would not be disproportionate to the revenue obtained. For it cannot be assumed that the legislature could not rightly have concluded that generally the number of employees bears a relationship to the size of the payroll and therefore to the amount of the tax, and that the large number of small employers and the paucity of their records of employment would entail greater inconvenience in the collection and verification of the tax than in the case of larger employers.

It would hardly be contended that the state, in order to tax payrolls, is bound to assume the administrative cost and burden of taxing all employers having a single employee. But if for that or any other reason it may exempt some, whether it should draw the line at one, three, or seven, is peculiarly a question for legislative decision. The decision cannot be said to be arbitrary because it falls in the twilight zone between those members of the class

which plainly can and those which plainly cannot expediently be taxed.

(b) Exemption of Particular Classes of Employers. It is arbitrary, appellees contend, to exempt those who employ agricultural laborers, domestic servants, seamen, insurance agents, or close relatives, or to exclude charitable institutions, interstate railways, or the government of the United States or of any state or political subdivision. A sufficient answer is an appeal to the principle of taxation already stated, that the state is free to select a particular class as a subject for taxation. The character of the exemptions suggests simply that the state has chosen, as the subject of its tax, those who employ labor in the processes of industrial production and distribution.

Reasons for the selections, if desired, readily suggest themselves. Where the public interest is served one business may be left untaxed and another taxed, in order to promote the one, *American Sugar Refining Co.* v. *Louisiana, supra; Heisler* v. *Thomas Colliery Co., supra; Aero Transit Co.* v. *Georgia Public Service Comm'n, supra,* or to restrict or suppress the other, *Magnano Co.* v. *Hamilton,* 292 U. S. 40; *Fox* v. *Standard Oil Co., supra; Quong Wing* v. *Kirkendall, supra; Singer Sewing Machine Co.* v. *Brickell,* 233 U. S. 304; *Alaska Fish Co.* v. *Smith, supra,* 48; *Great Atlantic & Pacific Tea Co.* v. *Grosjean, supra.* The legislature may withhold the burden of the tax in order to foster what it conceives to be a beneficent enterprise. This Court has often sustained the exemption of charitable institutions, *Bell's Gap R. Co.* v. *Pennsylvania, supra,* 237; cf. *Board of Education* v. *Illinois,* 203 U. S. 553, 563, and exemption for the encouragement of agriculture, *American Sugar Refining Co.* v. *Louisiana, supra,* 95; *Aero Transit Co.* v. *Georgia Public Service Comm'n, supra,* 291. Similarly, the legislature is free to aid a depressed industry such as shipping. The exemption of business operating for less than twenty weeks in the year

may rest upon similar reasons, or upon the desire to encourage seasonal or unstable industries.

Administrative considerations may explain several exemptions. Relatively great expense and inconvenience of collection may justify the exemption from taxation of domestic employers, farmers, and family businesses, not likely to maintain adequate employment records, which are an important aid in the collection and verification of the tax. The state may reasonably waive the formality of taxing itself or its political subdivisions. Fear of constitutional restrictions, and a wholesome respect for the proper policy of another sovereign, would explain exemption of the United States, and of the interstate railways, compare *Packer Corp.* v. *Utah, supra,* 109. In no case do appellees sustain the burden which rests upon them of showing that there are no differences, between the exempt employers and the industrial employers who are taxed, sufficient to justify differences in taxation.

(c) Tax on Employees. Appellees extend their attack on the statute from the tax imposed on them as employers to the tax imposed on employees. But they cannot object to a tax which they are not asked to pay, at least if it is separable, as we think it is, from the tax they must pay. The statute contains the usual separability clause. § 19. The taxation of employees is not prerequisite to enjoyment of the benefits of the Social Security Act. The collection and expenditure of the tax on employers do not depend upon taxing the employees, and we find nothing in the language of the statute or its application to suggest that the tax on employees is so essential to the operation of the statute as to restrict the effect of the separability clause. Distinct taxes imposed by a single statute are not to be deemed inseparable unless that conclusion is unavoidable. See *Field* v. *Clark,* 143 U. S. 649, 697; *Sonzinsky* v. *United States,* 300 U. S. 506.

From what has been said, it is plain that the tax *qua* tax conforms to constitutional requirements, and that our inquiry as to its validity would end at this point if the proceeds of the tax were to be covered into the state treasury, and thus made subject to appropriation by the legislature.

*Second. Validity of the Tax as Determined by Its Purposes.* The devotion of the tax to the purposes specified by the Act requires our consideration of the objections pressed upon us that the tax is invalid because the purposes are invalid, and because the methods chosen for their execution transgress constitutional limitations. It is not denied that since the adoption of the Fourteenth Amendment state taxing power can be exerted only to effect a public purpose and does not embrace the raising of revenue for private purposes. See *Green* v. *Frazier,* 253 U. S. 233, 238; *Milheim* v. *Moffat Tunnel Dist.,* 262 U. S. 710, 717; *Fallbrook Irrigation Dist.* v. *Bradley,* 164 U. S. 112, 158; *Jones* v. *Portland,* 245 U. S. 217, 221. The states, by their constitutions and laws, may set their own limits upon their spending power, see *Loan Association* v. *Topeka,* 20 Wall. 655; cf. *Parkersburg* v. *Brown,* 106 U. S. 487; *Cole* v. *La Grange,* 113 U. S. 1, but the requirements of due process leave free scope for the exercise of a wide legislative discretion in determining what expenditures will serve the public interest.

This Court has long and consistently recognized that the public purposes of a state, for which it may raise funds by taxation, embrace expenditures for its general welfare. *Fallbrook Irrigation Dist.* v. *Bradley, supra,* 161; *Green* v. *Frazier, supra,* 240, 241. The existence of local conditions which, because of their nature and extent, are of concern to the public as a whole, the modes of advancing the public interest by correcting them or avoiding their consequences, are peculiarly within the knowl-

edge of the legislature, and to it, and not to the courts, is committed the duty and responsibility of making choice of the possible methods. See *Fallbrook Irrigation Dist. v. Bradley, supra,* 160; *Jones* v. *Portland, supra,* 221, 224, 225; *Green* v. *Frazier, supra,* 239, 240. As with expenditures for the general welfare of the United States, *United States* v. *Butler,* 297 U. S. 1, 67; *Helvering* v. *Davis, post,* p. 619, whether the present expenditure serves a public purpose is a practical question addressed to the law-making department, and it would require a plain case of departure from every public purpose which could reasonably be conceived to justify the intervention of a court. See *Cincinnati Soap Co. v. United States, supra;* cf. *Jones* v. *Portland, supra.* The present case exhibits no such departure.

(a) Relief of Unemployment as a Public Purpose. Support of the poor has long been recognized as a public purpose, see *Kelly* v. *Pittsburgh,* 104 U. S. 78, 81. We need not labor the point that expenditures for the relief of the unemployed, conditioned on unemployment alone, without proof of indigence of recipients of the benefits, is a permissible use of state funds. For the past six years the nation, unhappily, has been placed in a position to learn at first hand the nature and extent of the problem of unemployment, and to appreciate its profound influence upon the public welfare. Detailed accounts of the problem and its social and economic consequences, to be found in public reports of the expenditures of relief funds, and in the studies of many observers, afford a basis for the legislative judgment. It suffices to say that they show that unemployment apparently has become a permanent incident of our industrial system; that it varies, in extent and intensity, with fluctuations in the volume of seasonal businesses and with the business cycle. It is dependent, with special and unpredictable manifestations, upon tech-

nological changes and advances in methods of manufacture, upon changing demands for manufactured products—dictated by changes in fashion or the creation of desirable substitutes, and upon the establishment of new sources of competition.

The evils of the attendant social and economic wastage permeate the entire social structure. Apart from poverty, or a less extreme impairment of the savings which afford the chief protection to the working class against old age and the hazards of illness, a matter of inestimable consequence to society as a whole, and apart from the loss of purchasing power, the legislature could have concluded that unemployment brings in its wake increase in vagrancy and crimes against property,[3] reduction in the number of marriages,[4] deterioration of family life, decline in the birth rate,[5] increase in illegitimate births,[6] impairment of

[3] See, e. g., National Commission on Law Observance and Enforcement (1931), Report on the Causes of Crime, No. 13, especially p. 312.

[4] From 1924 to 1932, inclusive, the marriage rate in Alabama, determined by marriages per 1,000 population, was as follows: 11.4; 11.9; 11.9; 11.6; 11.2; 11.2; 10.4; 9.7; 9.4 [derived from Statistical Abstract of the United States, 1926, Table 90; id., 1928, Table 95; id., 1930, Table 99 id., 1932, Table 80; id., 1936, Table 92]. The first sizeable decline came in 1930.

[5] See State Board of Health, Bureau of Vital Statistics, Report relating to the registration of births and deaths in the State of Alabama for the year ending 31st December, 1935, p. XXXVII: "Between 1910 and 1927, the trend in the birth rate was upward, except in 1918, the year in which the outbreak of influenza occurred and the following year. From 1927 to 1935, the trend has been downward, the rate of decline having been practically constant since 1928 forward, with the single exception in 1934. The rise in 1934 was due to a number of factors, including an increase in birth registration following the registration campaign and marriages."

[6] See Annual Report of the State Board of Health of Alabama, 1933, p. 166, Table XXV. The rate of illegitimate births per 1,000 live births, for the years 1929 through 1933, were 70.4; 74.6; 81.6; 88.7; 95.1.

the health of the unemployed and their families [7] and malnutrition of their children.[8]

Although employment in Alabama is predominantly in agriculture, and the court below found that agricultural unemployment is not an acute problem, the census reports disclose the steadily increasing percentage of those employed in industrial pursuits in Alabama.[9] The total amount spent for emergency relief in Alabama, in the years 1933 to 1935 inclusive, exceeded $47,000,000, of which $312,000 came from state funds, $2,243,000 from local sources, and the balance from relief funds of the federal government.[10] These figures bear eloquent witness to the inability of local agencies to cope with the problem without state action and resort to new taxing legislation. Expenditure of public funds under the present statute, for relief of unemployment, will afford some

[7] A survey of 4,137 people in Birmingham, Alabama, and covering three months in the spring of 1933, showed that the rate of illness [disabling illness per 1,000 persons] was 165 in families with no employed workers; 148 in families with at least one part-time worker, but no full-time workers; and 140 in families with at least one full-time worker. See Perrott and Collins, Relation of sickness to income and income change in 10 surveyed communities, Public Health Reports (United States Public Health Service), vol. 50, p. 595, at 606, Table 6.

[8] See Eliot, Martha M., Some effects of the depression on the nutrition of children, Hospital Social Service, vol. 28, p. 585; Palmer, Carroll E., Height and weight of children of the depression poor, Public Health Reports, vol. 50, p. 1106.

[9] Of those employed in Alabama the per cent. employed in industry were 19.5% in 1900; 21.4% in 1910; 30.7% in 1920; 33.6% in 1930; 24.3% in 1935. (Last figure estimated at the trial by Gist, formerly statistician of the Department of Agriculture, and since Feb. 1, 1936, economic adviser to the Commissioner of Agriculture of Alabama.) The decline in 1935 may be taken to corroborate the greater susceptibility of employment in industry to the depression.

[10] Figures obtained from Federal Emergency Relief Administration, as stated in Appendix to the Brief of Respondent, No. 837, Chas. C. Steward Machine Co. v. Davis, pp. 74–75, Table 17.

protection to a substantial group of employees,[11] and we cannot say that it is not for a public purpose.

The end being legitimate, the means is for the legislature to choose. When public evils ensue from individual misfortunes or needs, the legislature may strike at the evil at its source. If the purpose is legitimate because public, it will not be defeated because the execution of it involves payments to individuals. *Kelly* v. *Pittsburgh, supra; Knights* v. *Jackson,* 260 U. S. 12, 15; cf. *Mountain Timber Co.* v. *Washington,* 243 U. S. 219, 239–240. "Individual interests are aided only as the common interest is safeguarded." See *Cochran* v. *Board of Education,* 281 U. S. 370, 375; cf. *Clark* v. *Nash,* 198 U. S. 361, 367; *Hairston* v. *Danville & Western Ry. Co.,* 208 U. S. 598, 608; *Noble State Bank* v. *Haskell,* 219 U. S. 104, 110.

(b) Extension of Benefits. The present scheme of unemployment relief is not subject to any constitutional infirmity, as respondents argue, because it is not limited to the indigent or because it is extended to some less deserving than others, such as those discharged for misconduct. While we may assume that the state could have limited its award of unemployment benefits to the indigent and to those who had not been rightfully discharged from their employment, it was not bound to do so. Pov-

---

[11] Appellees point to an estimate that, largely because of the large agricultural population, only 26.81% of those employed in Alabama as of October 14, 1936, were covered by the Act.

But it was estimated at the trial by Gist [formerly statistician of the Department of Agriculture, and since Feb. 1, 1936, economic adviser to the Commissioner of Agriculture of Alabama], that if in 1941 there should be a recurrence of unemployment "somewhat equivalent to the period we have just come through, and employment in the industrial groups under consideration should drop to, say 170,000 [approximately the number employed in 1932], we would find Alabama with something like 64,000 unemployed persons who would be entitled to the benefits of this Act."

erty is one, but not the only evil consequence of unemployment. Among the benefits sought by relief is the avoidance of destitution, and of the gathering cloud of evils which beset the worker, his family and the community after wages cease and before destitution begins. We are not unaware that industrial workers are not an affluent class, and we cannot say that a scheme for the award of unemployment benefits, to be made only after a substantial "waiting period" of unemployment, and then only to the extent of half wages and not more than $15 a week for at most 16 weeks a year, does not effect a public purpose, because it does not also set up an elaborate machinery for excluding those from its benefits who are not indigent. Moreover, the state could rightfully decide not to discourage thrift. *Mountain Timber Co.* v. *Washington, supra,* 240. And as the injurious effects of unemployment are not limited to the unemployed worker, there is scope for legislation to mitigate those effects, even though unemployment results from his discharge for cause.

(c) Restriction of Benefits. Appellees again challenge the tax by attacking as arbitrary the classification adopted by the legislature for the distribution of unemployment benefits. Only the employees of those subject to the tax share in the benefits. Appellees complain that the relief is withheld from many as deserving as those who receive benefits. The choice of beneficiaries, like the selection of the subjects of the tax, is thus said to be so arbitrary and discriminatory as to infringe the Fourteenth Amendment and deprive the statute of any public purpose.

What we have said as to the validity of the choice of the subjects of the tax is applicable in large measure to the choice of beneficiaries of the relief. In establishing a system of unemployment benefits the legislature is not bound to occupy the whole field. It may strike at the

evil where it is most felt, *Otis* v. *Parker,* 187 U. S. 606, 610; *Carroll* v. *Greenwich Insurance Co.,* 199 U. S. 401, 411; *Lindsley* v. *Natural Carbonic Gas Co.,* 220 U. S. 61, 81; *Central Lumber Co.* v. *South Dakota,* 226 U. S. 157, 160; *Rosenthal* v. *New York,* 226 U. S. 260, 270; *Patsone* v. *Pennsylvania,* 232 U. S. 138, 144; *Keokee Coke Co.* v. *Taylor,* 234 U. S. 224, 227; *Silver* v. *Silver,* 280 U. S. 117, 123; *Hardware Dealers Mutual Fire Ins. Co.* v. *Glidden Co.,* 284 U. S. 151, 159, or where it is most practicable to deal with it, *Dominion Hotel* v. *Arizona,* 249 U. S. 265, 268–269. It may exclude others whose need is less, *New York, N. H. & H. R. Co.* v. *New York,* 165 U. S. 628, 634; *St. Louis Consolidated Coal Co.* v. *Illinois,* 185 U. S. 203, 208; *Engel* v. *O'Malley,* 219 U. S. 128, 138; *N. Y. Central R. Co.* v. *White,* 243 U. S. 188, 208; *Radice* v. *New York,* 264 U. S. 292, 294; *West Coast Hotel Co.* v. *Parrish,* 300 U. S. 379, or whose effective aid is attended by inconvenience which is greater, *Dominion Hotel* v. *Arizona, supra; Atlantic Coast Line R. Co.* v. *State,* 135 Ga. 545, at 555–556; 69 S. E. 725, as affirmed and approved, *Atlantic Coast Line R. Co.* v. *Georgia,* 234 U. S. 280, 289.

As we cannot say that these considerations did not lead to the selection of the classes of employees entitled to unemployment benefits, and as a state of facts may reasonably be conceived which would support the selection, its constitutionality must be sustained. There is a basis, on grounds of administrative convenience and expense, for adopting a classification which would permit the use of records, kept by the taxpayer and open to the tax gatherer, as an aid to the administration of benefit awards, as is the case here, where the recipients of benefits are selected from the employees of those who pay the tax. Special complaint is made of the discrimination against those with only six co-workers, as contrasted with those who have more. We have already shown that a distinction in terms of the number of employees is not on its face in-

valid.[12]  Here the legislative choice finds support in the conclusion reached by students of the problem,[13] that unemployment is less likely to occur in businesses having a small number of employees.

*Third. Want of Relationship Between the Subjects and Benefits of the Tax.*  It is not a valid objection to the present tax, conforming in other respects to the Fourteenth Amendment, and devoted to a public purpose, that the benefits paid and the persons to whom they are paid are unrelated to the persons taxed and the amount of the tax which they pay—in short, that those who pay the tax may not have contributed to the unemployment and may not be benefited by the expenditure.  Appellees' contention that the statute is arbitrary, in so far as it fails to distinguish between the employer with a low unemployment experience and the employer with a high unemployment experience, rests upon the misconception that there must be such a relationship between the subject of the tax (the exercise of the right to employ) and the evil to be met by the appropriation of the proceeds (unemployment).  We have recently stated the applicable doctrine. "But if the tax, *qua* tax, be good, as we hold it is, and the purpose specified be one which would sustain a subsequent and separate appropriation made out of the general funds of the Treasury, neither is made invalid by being bound to the other in the same act of legislation."  *Cincinnati Soap Co.* v. *United States, supra.*  Nothing is more familiar in taxation than the imposition of a tax upon a class or upon individuals who enjoy no direct

---

[12] See *supra,* footnote 2.

[13] W. I. King, Employment Hours and Earnings in Prosperity and Depression; Hansen, Bjornaraa, and Sogge, Decline of employment in the 1930–1931 depression in St. Paul, Minneapolis and Duluth, U. of Minn., Employment Stabilization Research Institute, vol. 1, No. 5, p. 20–25.

benefit from its expenditure, and who are not responsible for the condition to be remedied.[14]

A tax is not an assessment of benefits. It is, as we have said, a means of distributing the burden of the cost of government. The only benefit to which the taxpayer is constitutionally entitled is that derived from his enjoyment of the privileges of living in an organized society, established and safeguarded by the devotion of taxes to public purposes. See *Cincinnati Soap Co.* v. *United States, supra.* Any other view would preclude the levying of taxes except as they are used to compensate for the bur-

---

[14] Cigarette and tobacco taxes are earmarked, in some states, for school funds and educational purposes, Ala. Acts 1927, No. 163, §§ 2 (j), (k); Acts 1932, No. 113, § 15; Ark. Acts 1933, Nos. 135, 140, § 2; Tenn. Code (1932), § 1242; Tex. Laws 1935, c. 241, § 3, and in Georgia for pensions for Confederate soldiers, Ga. Laws 1923, pp. 39, 41.

Liquor license fees and taxes are paid into old age pension funds, Colo. Laws 1933, Sp. Sess., c. 12, § 27; police pension funds, N. Y. Tax Law (1934) § 435, subds. 4, 4–a; and school funds, N. M. Laws 1933, c. 159, § 10 (b); Wis. Laws Sp. Sess. 1933–34, chs. 3, 14.

Chain store taxes are sometimes earmarked for school funds, Ala. Acts 1935, No. 194, § 348, schedule 155.9; Fla. Laws 1935, c. 16848, § 15; Idaho Laws 1933, c. 113, § 10.

License and pari-mutuel taxes in states authorizing horse racing are devoted to fairs and agricultural purposes, Cal. Stat. 1933, c. 769, § 13; Ill. Rev. Stat. (Cahill, 1933) c. 38, § 316 (6); Mich. Acts 1933, No. 199, § 10; to highway funds, Nev. Comp. Laws (Hillyer, 1929) § 6223; and to an old age pension fund in Washington, Laws 1933, c. 55, § 9.

Unemployment relief, though financed in most states by special bond issues, has in some instances been financed by Gasoline Taxes, Ohio Laws 1933, File No. 8, §§ 1, 2; File No. 28; Okla. Laws 1931, c. 66, article 10, §§ 2, 3; Sales Taxes, Ill. Laws 1933, pp. 924, 926; Mich. Acts 1933, No. 167, § 25 (b); Utah Laws 1933, c. 63, § 21; Income Taxes, Wis. Laws 1933, c. 363, § 2; Miscellaneous Excise Taxes, Ohio Gen. Code (Page Supp. 1935) § 6212–49 (beer); § 5543–2 (cosmetics); § 5544–2 (admissions); Utah Rev. Stat. § 46–0–47 (beer).

den on those who pay them, and would involve the abandonment of the most fundamental principle of government—that it exists primarily to provide for the common good. A corporation cannot object to the use of the taxes which it pays for the maintenance of schools because it has no children. *Thomas* v. *Gay,* 169 U. S. 264, 280. This Court has repudiated the suggestion, whenever made, that the Constitution requires the benefits derived from the expenditure of public moneys to be apportioned to the burdens of the taxpayer, or that he can resist the payment of the tax because it is not expended for purposes which are peculiarly beneficial to him.[15] *Cincinnati Soap Co.* v. *United States, supra; Carley & Hamilton* v. *Snook, supra,* 72; *Nashville, C. & St. L. Ry. Co.* v. *Wallace,* 288 U. S. 249, 268; see *Union Refrigerator Transit Co.* v. *Kentucky,* 199 U. S. 194, 203.

Even if a legislature should undertake, what the Constitution does not require, to place the burden of a tax for unemployment benefits upon those who cause or contribute to unemployment, it might conclude that the burden cannot justly be apportioned among employers

---

[15] Similarly, special taxing districts for the maintenance of roads or public improvements within the district have been sustained, without proof of the nature or amount of special benefits. See *St. Louis & S. W. Ry. Co.* v. *Nattin,* 277 U. S. 157, 159; *Memphis & C. Ry. Co.* v. *Pace,* 282 U. S. 241, 248, 249; cf. *Missouri Pacific R. Co.* v. *Road District,* 266 U. S. 187. A different question is presented when a state undertakes to levy local assessments apportioned to local benefits. In that case, if it fails to conform to the standard of apportionment adopted, its action is arbitrary, see *Georgia Ry. & Elec. Co.* v. *Decatur,* 295 U. S. 165, 170, because there is a denial of equal protection. *Road Improvement District* v. *Missouri Pacific R. Co.,* 274 U. S. 188, 191–194; cf. *Georgia Ry. & Elec. Co.* v. *Decatur,* 297 U. S. 620. But if the assessment is apportioned to benefits it is not constitutionally defective because the assessment exceeds the benefits. *Roberts* v. *Richland Irrigation District,* 289 U. S. 71, 75.

according to their unemployment experience. Unemployment in the plant of one employer may be due to competition with another, within or without the state, whose factory is running to capacity; or to tariffs, inventions, changes in fashions or in market or business conditions, for which no employer is responsible, but which may stimulate the business of one and impair or even destroy that of another. Many believe that the responsibility for the business cycle, the chief cause of unemployment, cannot be apportioned to individual employers in accordance with their employment experience; that a business may be least responsible for the depression from which it suffers the most.

The Alabama legislature may have proceeded upon the view, for which there is abundant authority, that the causes of unemployment are too complex to admit of a meticulous appraisal of employer responsibility.[16] It may have concluded that unemployment is an inseparable incident of modern industry, with its most serious manifestations in industrial production; that employees will be best protected, and that the cost of the remedy, at least until more accurate and complete data are available, may best be distributed, by imposing the tax evenly upon all industrial production,[17] and in such form that it will be

---

[16] Report of President Hoover's Committee on Recent Social Trends (1933) 807 ff; J. M. Clark, Economics of Overhead Costs (1929) pp. 366–367; Douglas, Hitchcock, and Atkins, The Worker in Modern Economic Society (1925) p. 491 *et seq.;* Beveridge, Unemployment, a Problem of Industry (1930) pp. 100–103; W. C. Mitchell, Business Cycles; the problem and its setting (1927) pp. 87, 210, 238.

[17] See E. M. Burns, Toward Social Security (1936) pp. 70–73; P. Douglas, Social Security in the United States (1936) pp. 253–355; A. Epstein, Insecurity—A Challenge to America (3d ed. 1936) pp. 311–312, 317; Hansen, Murray, Stevenson, and Stewart, A Program for Unemployment Insurance and Relief in the United States (1934) pp. 16, 65–73.

added to labor costs which are ultimately absorbed by the public in the prices which it pays for consumable goods.

If the question were ours to decide, we could not say that the legislature, in adopting the present scheme rather than another, had no basis for its choice, or was arbitrary or unreasonable in its action. But, as the state is free to distribute the burden of a tax without regard to the particular purpose for which it is to be used, there is no warrant in the Constitution for setting the tax aside because a court thinks that it could have drawn a better statute or could have distributed the burden more wisely. Those are functions reserved for the legislature.

Since the appellees may not complain if the expenditure has no relation to the taxed class of which they are members, they obviously may not complain because the expenditure has *some* relation to that class, that those benefited are employees of those taxed; or because the legislature has adopted the expedient of spreading the burden of the tax to the consuming public by imposing it upon those who make and sell commodities. It is irrelevant to the permissible exercise of the power to tax that some pay the tax who have not occasioned its expenditure, or that in the course of the use of its proceeds for a public purpose the legislature has benefited individuals, who may or may not be related to those who are taxed.

Relationship of the State and Federal Statutes.

There remain for consideration the contentions that the state act is invalid because its enactment was coerced by the adoption of the Social Security Act, and that it involves an unconstitutional surrender of state power. Even though it be assumed that the exercise of a sovereign power by a state, in other respects valid, may be rendered invalid because of the coercive effect of a federal statute enacted in the exercise of a power granted to the national government, such coercion is lacking here.

It is unnecessary to repeat now those considerations which have led to our decision in the *Chas. C. Steward Machine Co.* case, that the Social Security Act has no such coercive effect. As the Social Security Act is not coercive in its operation, the Unemployment Compensation Act cannot be set aside as an unconstitutional product of coercion. The United States and the State of Alabama are not alien governments. They coexist within the same territory. Unemployment within it is their common concern. Together the two statutes now before us embody a coöperative legislative effort by state and national governments, for carrying out a public purpose common to both, which neither could fully achieve without the coöperation of the other. The Constitution does not prohibit such coöperation.

As the state legislation is not the product of a prohibited coercion, there is little else to which appellees can point as indicating a surrender of state sovereignty. As the opinion in the *Chas. C. Steward Machine Co.* case points out, full liberty of action is secured to the state by both statutes. The unemployment compensation fund is administered in accordance with state law by the state commission. The statute may be repealed at the will of the legislature, and in that case the state will be free to withdraw at any time its unexpended share of the Unemployment Trust Fund from the treasury of the United States, and to use it for any public purpose. And, for the reasons stated in the opinion in the *Chas. C. Steward Machine Co.* case, we conclude that the deposit by the state of its compensation fund in the Unemployment Trust Fund involves no more of a surrender of sovereignty than does the choice of any other depository for state funds. The power to contract and the power to select appropriate agencies and instrumentalities for the execution of state policy are attributes of state sovereignty. They are not lost by their exercise.

Many other arguments are pressed upon us. They require no discussion save as their answer is implicit in what we have said. The state compensation act, on its face, and as applied to appellees, is subject to no constitutional infirmity, and the decree below is

*Reversed.*

Mr. Justice McReynolds thinks that the decree should be affirmed.

Mr. Justice Sutherland, dissenting.

The objective sought by the Alabama statute here in question, namely, the relief of unemployment, I do not doubt is one within the constitutional power of the state. But it is an objective which must be attained by legislation which does not violate the due process or the equal-protection clause of the Fourteenth Amendment. This statute, in my opinion, does both, although it would have been a comparatively simple matter for the legislature to avoid both.

The statute lays a payroll tax upon employers, the proceeds of which go into a common fund to be distributed for the relief of such ex-employees, coming within the provisions of the statute, as shall have lost their employment in any of a designated variety of industries within the state. Some of these employers are engaged in industries where work continues the year round. Others are engaged in seasonal occupations, where the work is discontinued for a part of the year. Some of the employers are engaged in industries where the number of men employed remains stable, or fairly so, while others are engaged in industries where the number of the men employed fluctuates greatly from time to time. Plainly, a disproportionately heavy burden will be imposed by the tax upon those whose operations contribute *least* to the evils of unemployment, and, correspondingly,

the burden will be lessened in respect of those whose operations contribute *most*.

An example will make this clear. Let us suppose that A, an employer of a thousand men, has retained all of his employees. B, an employer of a thousand men, has discharged half of his employees. The tax is upon the payroll of each. A, who has not discharged a single workman, is taxed upon his payroll twice as much as B, although the operation of B's establishment has contributed enormously to the evil of unemployment while that of A has contributed nothing at all. It thus results that the employer who has kept all his men at work pays twice as much toward the relief of the employees discharged by B as B himself pays. Moreover, when we consider the large number and the many kinds of industries, their differing characteristics and the varied circumstances by which their operations are conditioned, the gross unfairness of this unequal burden of the tax becomes plain beyond peradventure. It is the same unfairness, in an aggravated form, as that which we so recently condemned as fatally arbitrary in *Railroad Retirement Board* v. *Alton R. Co.*, 295 U. S. 330. That case dealt with a federal statute which established a pension plan requiring payments to be made by all interstate railroad carriers into a pooled fund to be used for the payment of annuities indiscriminately to railroad employees, of whatever company, when they had reached the age of 65 years. This court, because of this pooling feature, among other things, held the act to be bad. We said (p. 357)—

"This court has repeatedly had occasion to say that the railroads, though their property be dedicated to the public use, remain the private property of their owners, and that their assets may not be taken without just compensation. The carriers have not ceased to be privately operated and privately owned, however much subject to

regulation in the interest of interstate commerce. There is no warrant for taking the property or money of one and transferring it to another without compensation, whether the object of the transfer be to build up the equipment of the transferee or to pension its employees. . . . The argument is that since the railroads and the public have a common interest in the efficient performance of the whole transportation chain, it is proper and necessary to require all carriers to contribute to the cost of a plan designed to serve this end. It is said that the pooling principle is desirable because there are many small carriers whose employees are too few to justify maintenance of a separate retirement plan for each." In support of that view, several cases had been cited. Those cases were reviewed and distinguished, and we concluded, p. 360, "that the provisions of the Act which disregard the private and separate ownership of the several respondents, treat them all as a single employer, and pool all their assets regardless of their individual obligations and the varying conditions found in their respective enterprises, cannot be justified as consistent with due process."

Cases which are relied upon here to sustain the Alabama statute were relied upon there to sustain the Retirement Act, *Mountain Timber Co.* v. *Washington*, 243 U. S. 219, among others. That case dealt with the State of Washington workmen's compensation act, requiring designated payments to be made by employers into a state fund for compensating injured workmen. But we pointed out (295 U. S. 359) that although the payments were made into a common fund, accounts were to be kept with each industry in accordance with the classification, and no class was to be liable for the depletion of the fund by reason of accidents happening in another class. And we said, "The Railroad Retirement Act, on the contrary, makes no classification, but, as above said, treats all the carriers as a single employer, irrespective of their several conditions."

If the Alabama act had followed the plan of the Washington act in respect of classification, we should have a very different question to consider. The vice of the Alabama act is precisely that which was condemned in the *Railroad Retirement Board* case. Indeed, the vice is more pronounced, since the federal act, relating as it did to railroads only, dealt with a homogeneous group of employers, while the Alabama act seeks to impose the character of "a single employer" upon a large number of employers severally engaged in entirely dissimilar industries.

It must be borne in mind that we are not dealing with a general tax, the proceeds of which are to be appropriated for any public purpose which the legislature thereafter may select, but with a tax expressly levied for a specified purpose. The tax and the use of the tax are inseparably united; and if the proposed use contravenes the Constitution, it necessarily follows that the tax does the same. *Cincinnati Soap Co.* v. *United States, ante,* pp. 308, 313.

Other states have not found it impossible to adjust their unemployment laws to meet the constitutional difficulties thus presented by the Alabama act. The pioneer among these states is Wisconsin. That state provides (Act of January 29, 1932, c. 20, Laws of Wis., Spec. Sess., 1931, p. 57, as amended) that while the proceeds of the tax shall be paid into a common fund, an account shall be kept with each individual employer, to which account his payments are to be credited and against which only the amounts paid to his former employees are to be charged. If he maintains his roll of employees intact, he will be charged nothing, and in any event only to the extent that his employment roll is diminished. When his tax contributions have reached a certain percentage of his payroll, the amount of his tax is reduced, and when they reach 10%, the tax is discontinued as long as that percentage remains. The result is that each employer

bears his own burdens, and not those of his competitor or of other employers. The difference between the Wisconsin and the Alabama acts is thus succinctly stated by the Social Security Board in its Informational Service Circular No. 5, issued November, 1936, pp. 8-9:

"(1) The plan for individual employer accounts provides for employer-reserve accounts in the State fund. Each employer's contributions are credited to his separate account, and benefits are paid from his account only to his former employees. If he is able to build up a specified reserve in his account, his contribution rate is reduced."

Such is the Wisconsin plan; while under the Alabama statute—

"(2) The pooled-fund plan provides for a pooling of all contributions in a single undivided fund from which benefits are paid to eligible employees, irrespective of their former employers."

Which of these plans is more advantageous from a purely economic standpoint does not present a judicial question. But from the constitutional point of view, in so far as it involves the ground upon which I think the Alabama act should be condemned, I entertain no doubt that the Wisconsin plan is so fair, reasonable and just as to make plain its constitutional validity; and that the Alabama statute, like the New York statute involved in *Chamberlin, Inc.* v. *Andrews,* 299 U. S. 515, affirmed by an equally-divided court during the present term, is so arbitrary as to result in a denial both of due process and equal protection of the laws.

I am authorized to say that MR. JUSTICE VAN DEVANTER and MR. JUSTICE BUTLER concur in this opinion.