**UNITED STATES v. SIEGEL BROS.,**
Inc., et al.
No. C. 3871.

District Court, E. D. Washington, S. D.
Oct. 21, 1943.

Edward M. Connelly, U. S. Atty., of Spokane, Wash., for plaintiff.

Nat U. Brown, of Yakima, Wash., and J. H. Immel, of Toppenish, Wash., for defendants.

SCHWELLENBACH, Distict Judge.

Defendants are charged by information with thirteen violations of Revised Maximum Price Regulation No. 169, issued by the Administrator of O.P.A. pursuant to the Price Control Act of 1942, 56 Stat. 28, 50 U.S.C.A.Appendix § 901 et seq. Counts 1, 3, 6, 8, 10, and 12 charge sales of beef for prices in excess of the maximum permitted by the regulation. The remaining counts charge the failure to furnish the buyers with a written statement setting forth the grade and sex as required by the regulation. To the information defendants demur.

In so far as the demurrer is based upon the failure to classify defendants as wholesalers, it is confessed. Plaintiff offers an amended information, permission to file which is granted. As to the other grounds, the demurrer will be deemed to be directed to the amended information.

Defendants first challenge the information on the ground that the Regulation 169 as amended violates the due process clause of the Fifth Amendment. Defendants con-

240

cede the constitutionality of the act including the power delegated to the Administrator to issue regulations. They assert that, since the challenged regulation fixes ceilings only on prices charged by the wholesaler and leaves the producers' and retailers' prices unchecked, it fails of its purpose to prevent inflation and confronts the defendant wholesalers with the equally disastrous alternatives of selling at a loss or abandoning their established business. Defendants assert this results in their being deprived of their property without due process of law. They attack the regulation as being arbitrary and capricious and without foundation in law.

Assuming arguendo that the regulation is subject to the constitutional infirmities that defendants assert, such deficiencies cannot be reached by a demurrer to the information. The constitutionality of the statute and that portion of it delegating power to issue regulations is conceded. I recognize that the exercise of the war power by Congress is subject to applicable provisions of the Constitution, including the guarantees of the Fifth Amendment, United States v. Cohen Grocery Company, 255 U.S. 81, 41 S.Ct. 298, 65 L.Ed. 516, 14 A.L.R. 1045; Highland v. Russell Car & Snow Plow Company, 279 U.S. 253, 261, 49 S.Ct. 314, 73 L.Ed. 688, and that a regulation made by an officer of the Government, the violation of which subjects the violator to criminal sanctions, must be strictly construed. Matthew Addy Company v. United States, 264 U.S. 239, 44 S.Ct. 300, 68 L.Ed. 658. I approach the problem presented by this demurrer with full recognition of these principles. The Fifth Amendment has no equal protection clause and even that of the Fourteenth, applicable only to the states, does not compel their Legislatures to prohibit all evils or none. A Legislature may hit at an abuse which it has found even though it has failed to strike at another. Farmers' & Merchants' Bank of Monroe, North Carolina et al. v. Federal Reserve Bank of Richmond, Virginia, 262 U.S. 649, 43 S.Ct. 651, 67 L.Ed. 1157, 30 A.L.R. 635. I recognize that the constitutionality of a regulation valid upon its face may be tested by proved facts tending to show that the regulation when applied to a particular situation is without support in reason. Railroad Retirement Board v. Alton Railroad Co., 295 U.S. 330, 55 S.Ct. 758, 79 L.Ed. 1468. However, the effect of such proof depends upon the relevant circumstances of each case as, for example, the administrative difficulty involved in any effort correctly to effectuate the congressional purpose which actuated the enactment of the statute. Carmichael v. Southern Coal & Coke Co., 301 U.S. 495, 511, 57 S.Ct. 868, 81 L.Ed. 1245, 109 A.L.R. 1327; South Carolina State Highway Department v. Barnwell Brothers, Inc., 303 U.S. 177, 192, 625, 58 S.Ct. 510, 82 L.Ed. 734. Congress may itself determine the means appropriate to this purpose and it is itself the judge of the means to be employed in exercising the powers conferred upon it. McDermott v. Wisconsin, 228 U.S. 115, 33 S.Ct. 431, 57 L.Ed. 754, 47 L.R.A.,N.S., 984, Ann.Cas.1915A, 39. In the Emergency Price Control Act of 1942, 50 U.S.C.A. Appendix § 901(a) the purposes of the act were declared to be: "to stabilize prices and to prevent speculative, unwarranted, and abnormal increases in prices and rents; to eliminate and prevent profiteering, hoarding, manipulation, speculation, and other disruptive practices resulting from abnormal market conditions", etc. The Congress, with elaborate detail and meticulous care, defined the procedure by which regulations might be promulgated by the Administrator. 50 U.S.C.A.Appendix § 902, 922. That the Congress intended the Administrator to differentiate and distinguish between individuals and classes is amply demonstrated in the Senate Report upon the bill where it is said: "Section 2(c) of the bill provides for flexibility in the establishment of maximum price and rent, and other regulations under the bill. It authorizes classifications, differentiations, adjustments, and reasonable exceptions which in the judgment of the Administrator are necessary or proper to effectuate the purposes of the bill. For example, classifications and differentiations may be made in terms of quantity, quality, or character of the use contemplated by the purchaser, or in terms of delivered prices on the one hand and f.o.b. prices on the other, or other conditions of sale. Differentiations of this character and many more that could be mentioned are essential in formulating workable maximum price regulations." Sen. Rep. No. 931, 77th Cong. 2d Sess.(1942) 17. The act itself provides for classifications and differentiations in the regulations. 50 U.S.C.A.Appendix § 902(c). The procedure used by the Administrator in the promulgation of Maximum Price Regulation No. 169 is detailed by the United States Emergency Court of

Appeals, Armour & Co. of Delaware v. Brown, 137 F.2d 233, 234, as follows: "Maximum Price Regulation No. 169, Beef and Veal Carcasses and Wholesale Cuts, was issued June 19, 1942, to become effective July 13, 1942. 7 F.R. 4653. The maximum price for each grade of each beef or veal carcass was fixed at the highest price actually charged by the seller during the base period March 16 to March 28, 1942, at or above which at least 30% of the total weight volume of the sellers' sales of carcasses of the same grade were made during such period. Meat prices were sought to be controlled at the packer level without maximum price control of livestock prices. It was thought by the Administrator that control of the prices of live meat animals would present serious administrative problems in view of the number of sellers, their wide distribution, and the difficulties of grading beef on the hoof. Further, it was considered that such control was not necessary in order to assure the packers a generally fair and equitable margin of profit because of the predominant influence of the wholesale price of meat in determining the level of livestock prices which resulted from the fact that the *domestic meat packing industry is the sole outlet for beef cattle.*"

The reasons motivating the Administrator in making the differentiation of which defendants complain are amply outlined in the Administrator's opinion In the Matter of Kaufman Beef Co. et al., O. P. A. Service 600:276,277, as follows: "Indeed, section 3(c) of the Emergency Price Control Act [50 U.S.C.A.Appendix § 903(c)] plainly contemplates that this type of control may be employed, and the basis for the exercise of this type of control in the case of beef lies in the fact that the domestic meat packing industry is the sole outlet for beef cattle. The predominant influence of the wholesale price of meat in determining the level of livestock prices is indicated by certain economic data which the Administrator, by order of January 16, 1943, incorporated into the record, giving Protestants an opportunity to rebut. This material consisted of a statement of economic data and other facts officially noticed by the Administrator including certain tables and charts showing the relationship between national income, the total domestic beef animal production and cattle and meat prices from 1924–1941. These charts show that historically there has been no direct relationship between the number of beef animals produced and the prices of those animals. Instead it appears that there is a direct relationship between national income, the price of dressed beef and the price of live animals. Evidently, the related prices are in general determined rather on the demand side through the wholesale meat market than on the supply side. The national income is not, of course, determined by the price of livestock. But the national income clearly affects the price paid for meat. Hence, the price determining point is primarily the wholesale meat industry."

Any attack upon the Regulation based on the theory that it was arbitrary and capricious must be measured by the standard as to whether its promulgation resulted from arbitrary and capricious action in disregard of law and not upon the standard of the correctness of the conclusion reached or the results achieved in the regulation itself. As Mr. Justice Roberts put it in Adams v. Nagle, 303 U.S. 532, 543, 58 S.Ct. 687, 693, 82 L.Ed. 999: "It would be arbitrary, in the proper sense of the term, for an official to act in the teeth of a statute or stubbornly to refuse to act at all where a statute commands action, but where he essays to exercise the jurisdiction conferred upon him, though his errors may be subject to subsequent correction, they cannot be enjoined as an arbitrary exercise of his authority. To hold otherwise would render orderly administrative procedure impossible."

Defendants' demurrer challenges the validity of the Regulation upon its face and, since it is evident from all of the facts of which I may take judicial notice that the Administrator did comply with the statutory requirements in reference to the promulgation of the challenged Regulation and since it appears from the reasons presented by him that the question as to his classification and differentiation was at least debatable, it is not available to defendants to challenge the Administrator's action by demurrer. United States v. Carolene Products Co., 304 U.S. 144, 154, 58 S.Ct. 778, 82 L.Ed. 1234. In fact, the decision upon the question of classification or differentiation being one for the Administrator, neither the finding of the court nor the verdict of a jury can be substituted for it. Price v. Illinois, 238 U.S. 446, 452, 35 S.Ct. 892, 59 L.Ed. 1400; Standard Oil Company v. City of Marysville, 279 U.S. 582, 49 S.Ct. 430, 73 L.Ed. 856; South Carolina State Highway

242

Department v. Barnwell Brothers, Inc., 303 U.S. 177, 625, 58 S.Ct. 510, 82 L.Ed. 734.

In thus disposing of defendants' demurrer, I have purposefully put aside the argument upon which plaintiff almost exclusively relies in its brief; that is, that "exclusive jurisdiction to determine the validity of any regulation or order was by Section 204 (b) of the Act, 50 U.S.C.A.Appendix § 924(b), placed in the Emergency Court of Appeals." Under this section of the statute, certain of the District Courts and the Circuit Court of Appeals for the Third Circuit, in Rottenberg v. United States and Yakus v. United States, 1 Cir., 137 F.2d 850, decided August 23, 1943, held that a defense based upon the alleged invalidity of a regulation is not available to a defendant in a criminal prosecution.

My first reason for choosing to decide the demurrer upon its merits rather than on the jurisdictional ground was that the Supreme Court in Lockerty v. Phillips, 319 U.S. 182, 189, 63 S.Ct. 1019, 1023, 87 L.Ed. 1339, declined to pass upon this question, using the following language: "We have no occasion to determine now whether, or to what extent, appellants may challenge the constitutionality of the Act or the Regulation in courts other than the Emergency Court, either by way of defense to a criminal prosecution or in a civil suit brought for some other purpose than to restrain enforcement of the Act or regulations issued under it." Such a refusal to determine a question not necessary to the decision in the case would be of no significance were it not for the fact that that issue was the one most strikingly in conflict as between the majority judges and the dissenting judge in the decision of the three-judge court in the District of New Jersey. Lockerty v. Phillips, D.C., 49 F.Supp. 513, 514. Circuit Judge Maris, writing the opinion, stated: "The portion of section 204(d) [50 U.S.C.A.Appendix § 924(d)] which we are considering deprives the courts of the country, other than the Emergency Court of Appeals, merely of jurisdiction and power to 'stay, restrain, enjoin, or set aside * * *.' These words refer to the type of affirmative relief sought to be obtained from a court, the type being injunctive in its nature; they do not indicate or imply that a court may not consider the constitutionality of the act if that question arises incidentally in a criminal prosecution or civil suit." Judge Fake, who wrote the dissenting opinion, said: "This leaves the plaintiffs herein stripped of their constitutional rights in the only forum where they may be tried on the indictments pending against them." Whether, under these circumstances, the fact that the Supreme Court declined to discuss the question is significant is a question upon which I do not hazard an opinion.

My second reason for putting aside plaintiff's contention is my profound conviction of the undesirability of the unnecessary use of statutory innovations, the constitutional competency of which must depend, as was said in the Rottenberg case [1 Cir., 137 F.2d 852], upon the fact that they were "born of the exigencies of war." In taking this position, I do not discount the necessity of the use by the Government of its inherent powers in war time. Every understanding person appreciates the importance of the time element in our war on the economic as well as the military front. No reasonable person complains when the Congress makes available legal short cuts to prevent delays in the efforts of those to whom are entrusted the conduct of either phase of this war. The recognition and use of war power is not new nor is it confined to this particular war in which we are now engaged. John Quincy Adams recognized it when he said: "This power is tremendous; it is strictly constitutional; but it breaks down every barrier so anxiously erected for the protection of liberty, property and life." Mr. Justice Story, in Martin v. Mott, 12 Wheat. 19, 30, 6 L.Ed. 537, recognized it with this language: "The power itself is to be exercised upon sudden emergencies, upon great occasions of state, and under circumstances which may be vital to the existence of the Union. A prompt and unhesitating obedience to orders is indispensable to the complete attainment of the object." The Supreme Court has repeatedly approved of its exercise. In Northern Pacific Railway Company v. North Dakota, 250 U.S. 135, 39 S.Ct. 502, 63 L.Ed. 897, it upheld the power to take over and operate the railroads; in Dakota Central Telephone Company v. State of South Dakota ex rel. Payne, 250 U.S. 163, 39 S.Ct. 507, 63 L.Ed. 910, 4 A.L.R. 1623, to take over and operate telephone and telegraph systems; in Selective Draft Cases (Arver v. United States), 245 U.S. 366, 38 S.Ct. 159, 62 L.Ed. 349, L.R.A. 1918C, 361, Ann.Cas.1918B, 856, to draft man power for service in the armed forces; in Ruppert v. Caffey, 251 U.S. 264, 40 S.Ct. 141, 64 L.Ed. 260, to prohibit the manu-

facture or sale of alcoholic beverages; in Highland v. Russell Car & Snow Plow Company, 279 U.S. 253, 49 S.Ct. 314, 73 L.Ed. 688, to regulate the prices of certain commodities; in Block v. Hirsh, 256 U.S. 135, 41 S.Ct. 458, 65 L.Ed. 865, 16 A.L.R. 165, to control rents. In 1931, in the case of United States v. Macintosh, 283 U.S. 605, 622, 51 S.Ct. 570, 574, 75 L.Ed. 1302, it defined the scope of the powers of the Government in time of war with the following language: "To the end that war may not result in defeat, freedom of speech may, by act of Congress, be curtailed or denied so that the morale of the people and the spirit of the army may not be broken by seditious utterances; freedom of the press curtailed to preserve our military plans and movements from the knowledge of the enemy; deserters and spies put to death without indictment or trial by jury; ships and supplies requisitioned; property of alien enemies, theretofore under the protection of the Constitution, seized without process and converted to the public use without compensation and without due process of law in the ordinary sense of that term; prices of food and other necessities of life fixed or regulated; railways taken over and operated by the government, and other drastic powers, wholly inadmissible in time of peace, exercised to meet the emergencies of war." No harm can come to our constitutional system from the temporary by-passing of certain recognized safeguards so long as it is acknowledged that the power which authorizes such by-passing is temporary. The only danger involved is the repeated use of such powers when they are relied upon unnecessarily. Governments are not destroyed by the power they possess. Power is the source of strength by which governments may be perpetuated. It is by proper use of its power that a government can and is expected to protect the people who live under it. The rock upon which governments founder and are ultimately destroyed is the intemperate, unrestrained, and unnecessary use of power. It must not be permitted that those in charge of Government may become so accustomed to the short cuts as to forget the existence of the regular routes. The people must not be permitted to become so conditioned against the shocks and stresses of the short cuts that their softened will to demand a return to the familiar paths may become ineffectual. Courts must not permit themselves to become so in the habit of resorting to the term "born of the exigencies of war" that they will conceive that every emergency is capable of giving birth to equally extraordinary legal formulae. The Supreme Court has recognized the necessity of its protecting against such eventualities. In Ex parte Quirin, 317 U.S. 1, 19, 63 S.Ct. 2, 6, 87 L.Ed. ——, the Chief Justice explained the special term of the court with the following language: "In view of the public importance of the questions raised by their petitions and of *the duty which rests on the courts, in time of war as well as in time of peace, to preserve unimpaired the constitutional safeguards of civil liberty,* and because in our opinion the public interest required that we consider and decide those questions without any unavoidable delay, we directed that petitioners' applications be set down for full oral argument at a special term of this Court, convened on July 29, 1942." (Emphasis mine.)

Defendants' contention that counts 2, 4, 5, 7, 9, 11, and 13 of the information are defective is based upon a misunderstanding of what was referred to in the amendment of July 16, 1943, sec. 2(j), Public Law 151, 78th Congress, 50 U.S.C.A. Appendix § 902(j). It provided: "Nothing in this Act shall be construed * * * (2) as authorizing the Administrator to require the grade labeling of any commodity." If Regulation 169 was within the ambit of the legislative intent as expressed by this amendment, its application would necessarily be limited to Sec. 1364.476(c) of the regulation which is entitled "Duty to identify products by grade marks." The amendment on which defendants rely does not attempt to reach the question of grading meats nor the section of the regulation on which the counts of the information are based. That is Sec. 1364.407 which is entitled "Records and reports" and subsection (f) of which reads as follows: "Every person making a sale of any beef carcass, beef wholesale cut, veal carcass, veal wholesale cut, processed product or other meat item subject to this revised regulation shall furnish to the purchaser at the time of delivery a written statement setting forth the name and address of the buyer and seller; identifying each such item sold; and setting forth the quantity, the grade, including sex identification as to cow, stag, and bull, and the weight thereof, and the price charged and received therefor, including a separate statement of the transporta-

244

tion and local delivery charge as required by Sec. 1364:454(a) (6)." These defendants are charged only with the failure to furnish to the buyers the written statements setting forth the grade, including sex identification, as required by Sec. 1364.407(f). This does not involve the question of grade labeling. The so-called Taft amendment of July 16, 1943, did not attempt to prohibit this regulatory requirement. Therefore, there is no basis to defendants' complaint against these counts in the information.

The demurrer is overruled.