JOHN H. GRIFFIN ET AL. *v.* ANNE ARUNDEL
COUNTY, MARYLAND ET AL.

[No. 250, September Term, 1974.]

*Decided March 1?, 1975.*

116

The cause was argued before POWERS, DAVIDSON and MOORE, JJ.

*Nicholas J. Fotos* and *Robert D. Frierson* for appellants.

*Roger D. Redden,* with whom were *Paul F. Borden, County Solicitor for Anne Arundel County, John M. Court, Assistant County Solicitor for Anne Arundel County* and *William Gar Richlin* on the brief, for appellees.

MOORE, J., delivered the opinion of the Court.

John H. Griffin and six other residents and property owners of historic Annapolis brought a class action in equity in the Circuit Court for Anne Arundel County seeking injunctive and declaratory relief against Anne Arundel County and the State of Maryland. The gravamen of the complaint was that the County Council for Anne Arundel County imposes an ad valorem property tax on all property owners of the County, including property owners within the

City of Annapolis, for services such as fire and police protection, public works, recreation and parks, planning and zoning, mosquito control and Board of Liquor Control — services actually being supplied exclusively through their own city government and with respect to which there is also a city ad valorem property tax; and that an ad valorem property tax rate differential allowed by the County for municipal residents is arbitrary, represents only one-third of the amount to which they are lawfully entitled and bears a disproportionate relationship to benefits actually received.

The specific relief requested was the entry of a declaratory decree that (a) the imposition by the County of ad valorem property taxes upon the owners of real property in the City of Annapolis "is, and if continued will be, illegal and void in violation of Articles 15 and 23 of the Maryland Declaration of Rights and the Fourteenth Amendment to the Constitution of the United States" ; and (b) that tax levies imposed upon the appellants since 1966 be declared void and illegal and that damages be awarded to petitioners and the class they represent for the difference between the tax differential allowed and the greater amount to which they were legally entitled.[1] The injunctive relief prayed was also twofold. Appellants sought injunctions (a) forbidding the collection of any real property tax against the petitioners and all property owners similarly situated for the fiscal year 1973-74 "based on the illegal differential taxation imposed" ; and (b) forbidding any tax sales for delinquent taxes against the petitioners or the members of the class.

The chancellor (Childs, J.) sustained, without leave to amend, the demurrer interposed by the State of Maryland and no error is assigned with respect to that ruling. In a memorandum opinion and order the chancellor, in reliance upon *Hunt v. Montgomery County*, 248 Md. 403, 237 A. 2d 35 (1968) and Maryland Rule 610, rendered a summary declaratory judgment in favor of Anne Arundel County,

---

1. Appellants conceded below, in their oral argument, that they were legally unable to justify their prayers for damages or a refund of taxes previously paid.

finding no basis for an adjudication of violations of the state or federal constitutions and that the questions presented were of legislative rather than judicial cognizance.

I

*FACTUAL BACKGROUND*

The City of Annapolis is a municipal corporation governed by the provisions of Article 23A of the Maryland Code which implements Article XI-E of the Maryland Constitution, ratified November 2, 1954. Anne Arundel County adhered to the county commissioner form of government until 1964 when it became a charter county pursuant to Article XI-A of the Maryland Constitution, ratified November 2, 1915, and Article 25A of the Code. Since the fiscal year 1966, except for the fiscal years 1970 and '71, the County Council has granted to property owners within the City of Annapolis a tax differential as shown by the following table adapted from paragraph 24 of the bill of complaint:

| *Fiscal Year* | *Rate Charged* | |
| --- | --- | --- |
| | *City* | *Non-City* |
| 1966 | 2.60 | 2.83 |
| 1967 | 2.63 | 2.86 |
| 1968 | 2.69 | 2.89 |
| 1969 | 2.69 | 2.89 |
| 1970 | 3.00 | 3.00 |
| 1971 | 3.00 | 3.00 |
| 1972 | 2.95 | 3.25 |
| 1973 | 2.82 | 3.12 |
| 1974 | 2.29 | 2.59 |

The tax differential granted, as distinguished from the differential to which appellants claim to be entitled, is alleged in the bill of complaint to be as follows:

| Fiscal Year | Tax Differential | |
|---|---|---|
| | Granted | Claimed |
| 1966 | .23 | .56 |
| 1967 | .23 | .61 |
| 1968 | .20 | .74 |
| 1969 | .20 | .91 |
| 1970 | .00 | .81 |
| 1971 | .00 | .80 |
| 1972 | .30 | .75 |
| 1973 | .30 | .97 |
| 1974 | .30 | .85 |

The case was disposed of without the taking of testimony, as indicated above, and the record before us does not disclose, for any of the fiscal years in question, the constituent elements of the tax rate differential nor the legal or legislative means utilized to effect the differential, nor, indeed, the basis for appellants' calculations of the differential claimed.[2]

Appellants concede that the tax money paid by them to the County is spent for public purposes but they contend that the taxes are levied, not for the benefit of the "public of the City of Annapolis, but exclusively for the public of Anne Arundel County, specifically excluding those taxpayers of said County within the said City." The failure of the County government to provide what is termed a lawful tax differential for real property owners within the City is alleged to constitute illegal "double taxation" prohibited by Article 15 and Article 23 of the Maryland Declaration of Rights and violative of Section One of the Fourteenth Amendment to the Federal Constitution, in that appellants

2. An exhibit annexed to the bill of complaint, and represented to be a statement of the County's "intent" appears to constitute a work sheet relating to the County Budget for the fiscal year 1966 at the top of which it is stated: "This year a formula was developed to establish a proper relationship within the City of Annapolis regarding their proportional costs of the total County operation. Through this formula, Annapolis will not be called upon to pay the County for services that are being supplied through their own City government." No reference to this exhibit was made in the proceeding below, nor upon this appeal.

are denied equal protection of the laws and are deprived of their property without due process.

As the chancellor observed in his written opinion, the issues surrounding County-City relationships presented in the instant case are not new and are not confined to Anne Arundel County alone. They have long engaged the attention of the General Assembly of Maryland and Commissions appointed pursuant to legislative action. Thus, a Joint Resolution of the 1959 Maryland General Assembly (Joint Resolution #26) resulted in the appointment by the Governor of a 13-member commission "to study problems of City-County fiscal relationships" and its report [3] to the Governor almost four years later contained the following observations:

> "The problem of tax differentials is one which has long been of concern to state and local government officials, not only in Maryland but in other states as well. A number of attempts have been made to cope with it, in order to eliminate some of the inequities which have existed in the tax structures of neighboring jurisdictions within states and counties, but to date none have been wholly successful.
>
> "The problem arises primarily as a result of the fact that in many counties the county government established a single tax rate on all taxable property, whereas it may appear to provide some of its services only in the unincorporated areas of the county and leave the furnishing of these services within the cities and towns to the municipal governments. The results are that owners of property within the incorporated areas pay both the county and municipal governments for these services, such as street maintenance or police service, but they may receive the services only from

---

[3]. Report of the Maryland Commission on City-County Fiscal Relationships transmitted to J. Millard Tawes, Governor of Maryland, on December 30, 1963, by Clayton C. Carter, Chairman.

the city or town governments. The resident of the municipality thus pays the same amount in taxes to the county government as does the resident of the unincorporated area, but receives none of these services from the County in return for his tax dollars.

"The problem of tax differentials is noted *most often in Maryland in connection with such activities as street construction and maintenance, police and fire services, in which municipal governments frequently engage.* It is encountered *least often in connection with education, judicial administration and welfare matters, since the county governments are normally charged with these responsibilities and the city and town governments neither provide services nor levy taxes to underwrite them.* These activities would be the responsibility of the county governments whether or not the municipalities existed." p. 10 (Emphasis added.)

It was the conclusion of the Commission that the problem was not amenable to any "single solution and that any possible solutions would have to be developed on a County-by-County basis." Toward this end, the Commission recommended that county and municipal governments be encouraged to create Commissions to identify governmental activities within the County with respect to which financial inequities exist as between taxpayers within incorporated areas and those in unincorporated areas; and to devise solutions to alleviate the problem.

The chancellor in his written opinion in this case specifically noted that the entire matter was also the subject of an extensive Report by the Committee on Taxation and Fiscal Affairs of the Legislative Council of Maryland in 1970.[4]

---

4. This Report of the Legislative Council resulted from the referral to the Council of House Bill 1473 introduced by Delegates Fornos, Anderson and Allen of Anne Arundel County and Delegate Santangelo of Prince George's County which would have required county governments to levy a tax on

122

With reference to then existing county-municipal fiscal relationships, that Report pointed out that a number of different practices were concurrently in effect in the counties. These included:

1.  *County Property Tax Rate Differential*
    Harford County, for example, allowed a .20 cent differential, under a specifically enacted Ordinance, reflecting expenditures for County roads and street lighting; Cecil County in 1969 and Allegany in 1970 enacted Local Laws that authorized the Counties to impose a differential property tax rate for municipal residents.

2.  *Reimbursement of Portion of County Taxes Collected in Municipal Corporations*
    Caroline, Carroll and Queen Anne Counties provided reimbursement to the municipal corporations for a portion of the County taxes collected on the municipal assessed valuation.

3.  *Fixed County Grant*
    Fixed grants were made in Allegany, Dorchester and Somerset Counties mandated by local law and to be utilized for street maintenance; the City of Takoma Park received a grant from Montgomery County in lieu of County expenditures for police services and public libraries within the City limits.

4.  *Proceeds of County Revenue Operations*
    The Counties of Harford, Kent, Somerset and Worcester paid a portion of the proceeds from

property located within the municipal corporation which reflected only those services which the County provided to municipal residents; and not to reflect expenditures for services provided solely to residents outside of municipal corporations such as police and fire protection, street maintenance and lighting, refuse collection, code enforcements, planning and zoning, parks and recreation and utilities.

In addition, Senate Bill 150, introduced by Senator Conroy of Prince George's County, has been referred to the Legislative Council after an unfavorable report by the County's senatorial delegation.

the profits of County Liquor Dispensaries to the municipal corporations.

5. *Provision of Services*

Certain services would be provided by the County to the municipality without charge. Illustrative of these services was staff assistance for planning and zoning and Code enforcement programs.

6. *State Mandated Grants*

Two State mandated grants to counties were noted (a) .37% of the taxable income of the residents of the municipality; and (b) a sum equivalent to the amount of the tax on bank stock that the municipality received in the 1968 fiscal year.

In the Report's discussion of the subject of property tax rate differential, it was stated that a lower county property tax for residents of municipal corporations would prevent "any 'double taxation.' " The differential was deemed to be more "visible" to the taxpayer. But it was also pointed out that: "[i]f the premise of the property tax differential [for municipal residents] is accepted as public policy" the implementation thereof raises a number of questions with respect to the calculation of the costs of services not provided to municipal residents and how to determine what revenues are involved.[5]

The ultimate findings of the Report of the Taxation and Fiscal Affairs Committee with respect to property tax rate differentials for municipal residents were as follows:

> *"The Committee on Taxation and Fiscal Matters finds that there are instances in Maryland where the residents of municipal corporations are paying county taxes for services that are not provided to them by the county and for which they also must*

---

5. For example, some municipal expenditures are supplemental to and not in lieu of county services, such as a county park outside the municipal limits which also benefits the municipal residents.

124

*pay municipal taxes for the same service. The most easily identified service is highway maintenance. Other services that can be subject to double taxation are police protection, parks, recreation, refuse disposal, planning and zoning, and mosquito control.*

"The Committee further finds that the existing allocation of State-shared taxes among counties and municipal corporations and the existing requirements for the counties to make certain revenues available to municipal corporations have created *instances where municipal corporations are receiving a disproportionate share of revenues for the type of services provided. Consequently, while some municipal residents are being subject to double taxation, some municipal residents are receiving double benefit from the allocation of non-property tax revenues.* In such instances the residents outside of municipal corporations are paying a higher property tax rate than they should be paying.

*"The Committee does not believe that a state mandated property tax rate differential for municipal residents is warranted at this time.* It believes that while State action could correct some inequities it might also tend to promote the uneconomical or ineffective providing of services by small units of government and limit the flexibility of transferring or merging governmental services at the local level. *The Committee also believes because of the variation in the types of governmental services provided by the local governments that determination of the countywide nature of a service can only be made at the county level and not at the state level."* (Emphasis added.)

Special note was taken by the Committee with respect to Anne Arundel County as shown by the following excerpt from the Report's Conclusions and Recommendations:

"The Committee notes in Anne Arundel County
where the question of a property tax rate
differential has been the subject of considerable
discussion by both public officials and private
citizens that the County Council of Anne Arundel
County and the Mayor and Aldermen of the City of
Annapolis have enacted similar resolutions calling
for a study of county-city fiscal relationships by a
management and fiscal consultant. The Committee
hopes that both units of government take prompt
action to initiate this study."

A consulting firm was indeed engaged to make a study
and report of the fiscal relationships between the City of
Annapolis and the County but the results of its Report [6] do
not appear in the record. It *is* disclosed, however, that there
was subsequently established a Committee known as the
"Annapolis Fair Tax Committee", of which the appellant,
John H. Griffin, was chairman. A communication from Mr.
Griffin to the County Council dated May 14, 1973, annexed
to the bill of complaint, made it plain that the Committee
did not object to the County's not expending in Annapolis
tax monies for fire and police protection, public works,
recreation and parks and similar services; but that it was
considered unlawful and improper for the County to tax city
residents for these and similar services which were being
furnished only to that part of the County outside the city
limits of Annapolis. During the fiscal year 1972-73,
appellant stated, the excess levy for these services on

---

6. The report, by the Davon Management Company of Wash., D.C., was
transmitted to the City-County Tax Differential Committee on May 1, 1971.
The first of three major findings contained in the report was the following:
"First, a review of county service benefits as distributed between city and
other county taxpayers reveals that for true equity, *the city taxpayer
should receive tax relief in recognition of a number of county services of
which the city resident receives no obvious benefit.* In all cases the lack of
benefit to the city resident stems from the fact that the city provides the
same service as the county within its boundaries. The functional areas
where city residents do not receive proportionate benefits are: roads and
bridges, storm drains, mosquito control, street lights, signalization, police,
fire inspections and permits (other than electrical inspections and animal
control), planning and zoning and recreation and parks." (Emphasis in
original.)

Annapolis residents had been calculated by a joint City-County Tax Differential Committee to be more than $700,000. Attached to the communication was an Ordinance adopted by the County Council of Prince George's County in its 1972 Legislative Session providing for "a reduced tax to citizens in a municipality for services rendered by a municipality which relieve the County from increased expenditures to supply these services." [7]

Notwithstanding the broad language of the prayers for relief contained in the petition below, it appears clear that appellants do not contend that they are not subject to the imposition of *any* ad valorem property tax by the County. Rather, their contention is that they are being illegally taxed by the County for a substantial portion of the County tax levy. [8]

## II

### CONSTITUTIONAL ISSUES

Since the power to tax is an inherent attribute of sovereignty and since a County is only an agency or subdivision of the State, it is fundamental that the power of a County (or County Board of Commissioners) to tax is not inherent but is a delegated power and exists only when and to the extent granted by the State. The authority of a municipality to tax is similarly a delegated power. The County's authority to tax is derived from Article XI-A of the Constitution and Code, Article 25A, Section 5 (O); a municipality's authority derives from Article XI-E of the Constitution and Code, Article 23A, Section 2.

With respect to all taxes in Maryland — State, County and Municipal — Article 15 of the Declaration of Rights provides

---

7. Bill #CB 205-1972 introduced by Councilmen White, Francois and Hart on November 6, 1972 to add a new section 7-5.3 to the Prince George's County Code, adopted November 29, 1972.

8. Appellant Griffin, according to the bill of complaint, was in effect overcharged by the County in the sum of $74.83 for the 1972-3 tax year. This, he alleged, was the amount which should have been deducted from his County tax bill of $384.31 and represented "the unlawful double taxation levied by the County for the said 1972-3 tax year."

that they . . . "shall be *uniform* within each class or sub-class of land, improvements on land and personal property which the respective taxing powers may have directed to be subjected to the tax levy; yet fines, duties or taxes may properly and justly be imposed, or laid with a political view for the good government and benefit of the community." (Emphasis added.)

Another applicable State constitutional provision is Article 23 of the Declaration of Rights, the due process clause: "That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land."

Also generally applicable, of course, are the provisions of Section One of the Fourteenth Amendment to the Constitution of the United States: ". . . nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

Both in the bill of complaint and in argument below, considerable emphasis has been laid by appellants upon the claim of "double taxation." As Mr. Justice Holmes stated in now familiar language in the case of *Fort Smith Lumber Company v. Arkansas*, 251 U. S. 532 (1920): "The objection to the taxation as double may be laid on one side. That is a matter of state law alone. The Fourteenth Amendment no more forbids double taxation than it does doubling the amount of a tax; short of confiscation or proceedings unconstitutional on other grounds." Double taxation occurs only when "two taxes of the same character are imposed on the same property, for the same purpose, by the same taxing authority within the same jurisdiction during the same taxing period." Rhyne, *Municipal Law* (1957) , p. 673, cited in *Associated Home Builders v. City of Walnut Creek*, 484 P. 2d 606, (Cal. 1971). Where there are different taxing authorities, as here, it is established that there can be levies by the  respective taxing entities on the same property for

similar purposes without resulting in double taxation. *Kucharski v. White,* 247 N.E.2d 428 (Ill. 1969). In *Kucharski* the Supreme Court of Illinois upheld a tax levy by a municipality for, among other things, the support of a library facility notwithstanding the fact that the taxpayer had already been taxed by the "Prospect Heights Library District" for another library. *See also Board of Highway Commissioners v. City of Bloomington,* 97 N. E. 280 (Ill. 1911); *Fox Bakersfield Theatre Corp. v. City of Bakersfield,* 222 P. 2d 879 (Cal. 1950). *Baker v. Druesedow,* 263 U. S. 137 (1923).

The tax challenged here is the only ad valorem tax levied on the appellants' property by Anne Arundel County. As the chancellor observed: "The city residents are taxed as county residents in the same manner and according to the same rate (before any differential adjustment) as those county residents living outside the city. *The county* imposes no additional tax on the city dwellers, as such." (Emphasis added.) If the County were to impose an additional levy of the same kind, double taxation would result. That, however, is not the case.

All assessable real property within the City is taxed by the County at the same rate. Thus, the rule of uniformity — the principal mandate of Article 15 of the Declaration of Rights — is satisfied. As stated in McQuillin's treatise on *Municipal Corporations* (3d ed., Vol. 16, § 44.21): "The rule of uniformity is not violated by double taxation resulting from taxes levied by different authorities if each authority adheres to the uniformity rule in its levies." *State v. Leaksville,* 165 S.E.2d 201 (N.C. 1969); *City of Pelly v. Harris County Water Control & Improvement District,* 198 S.W.2d 450 (Tex. 1946).

Furthermore, the constitutionality of the imposition of an ad valorem property tax does not require the demonstration of specific benefit to the property owners who are taxed. This principal was stated by the Supreme Court of the United States in the case of *St. Louis and S.W. Railway Co. v. Nattin,* 277 U. S. 157 (1928) and *Memphis and C. Railway*

*Co. v. Pace,* 282 U. S. 241 (1931). In the *Nattin* case the Court observed:

> "As the assailed tax was general and ad valorem its legality does not depend upon the receipt of any special benefit by the taxpayer."

In *Pace, supra,* the Court stated:

> "*Where the tax is laid generally on all property or all real property within the taxing unit, it does not become arbitrary or discriminatory merely because it is spread over such property on an ad valorem basis; nor where the tax is thus general and ad valorem does its validity depend upon the receipt of some special benefit as distinguished from the general benefit to the community.*" (Emphasis added.)

Speaking more generally with respect to the element of benefit, the Supreme Court said in *Carmichael v. Southern Coal & Coke Co.,* 301 U. S. 495 (1937):

> "*A tax is not an assessment of benefits.* It is as we have said, a means of distributing the burden of the cost of government. The only benefit to which the taxpayer is constitutionally entitled is that derived from his enjoyment of the privileges of living in an organized society, established and safeguarded by the devotion of taxes to public purposes." (Emphasis added.)

In a relatively recent State case, *People ex rel. Hanrahan v. Caliendo,* 277 N.E.2d 319 (Ill. 1971) the Supreme Court of Illinois rejected a challenge to the constitutionality of the State's Urban Transportation District Act and the creation pursuant thereto of the Chicago Urban Transportation District, established for the purpose of providing mass transportation facilities. Pursuant to the Act, the City Council of Chicago adopted a resolution designating an area within the City as an urban transportation district and plans were adopted to construct new rapid transit routes and

systems at an estimate cost of $750,000,000. Part of the cost was to be funded through the issuing of bonds and the funds to satisfy the bonds were to come from general taxes to be levied on the real and personal property situated in the district. The Court upheld the contention that the legality of the district did not depend on whether the property within it would be specifically benefited, "as it was created for the 'general benefit of the community' within the meaning of *Memphis and Charleston Railway Co. v. Pace*, 282 U. S. 241, 51 S. Ct. 108, 75 L. Ed. 315, and *St. Louis and Southwestern Railway Co. v. Nattin*, 277 U. S. 157, 48 S. Ct. 438, 72 L. Ed. 830." The Court also observed:

> "*[T]he defendants contend, and correctly, we consider, that general public improvements, to be paid for by general ad valorem property taxes, do not impose upon the taxing authority any burden of showing special benefit. In Nattin the court said: 'As the assailed tax was general and ad valorem, its legality does not depend upon the receipt of any special benefit by the taxpayer.'*" (Emphasis added.)

In the instant case the proceeds from the ad valorem tax levied by the County are being employed for the benefit of the residents of Anne Arundel County. This is all that the Fourteenth Amendment of the United States Constitution specifically requires and we are constrained to agree that the fact that the appellants have not received what they conceive as their "pro rata" proportion of benefits is insufficient to support a claim that the County has violated the federal Constitution.[9]

Furthermore, we are impelled to the conclusion that there is no constitutional basis for appellants' claim of unlawful

---

9. The argument contained in appellants' reply brief that Article 15 of the Declaration of Rights requires that ad valorem taxes imposed by the County not only be uniform but also benefit the community being taxed wrongly seems to assume that the term "community" is the geographic area outside the city limits. The obvious meaning of the "community" which is to be benefited by the appropriate tax is the political subdivision itself — here, the entire County, including the land within the city.

discrimination against residents of the County residing in Annapolis in favor of the County residents residing elsewhere. Unfortunately for the taxpayers, the standard of review of State policy under the equal protection clause of the Fourteenth Amendment is narrow indeed. As the Supreme Court stated in *San Antonio Independent School District v. Rodriguez*, 411 U. S. 1, 40 (1973):

> "A century of Supreme Court adjudication under the Equal Protection Clause affirmatively supports the application of the traditional standard of review, which requires only that the State's system be shown to bear some rational relationship to legitimate state purposes."

And where questions of State fiscal policy are concerned the above statement of the Court is particularly appropriate, as is demonstrated in the following statement in *Madden v. Kentucky*, 309 U. S. 83, 87-88 (1940):

> "It has . . . been pointed out that in taxation, even more than in other fields, legislatures possess the greatest freedom in classification. Since the members of a legislature necessarily enjoy a familiarity with local conditions which this Court cannot have, *the presumption of constitutionality can be overcome only by the most explicit demonstration that a classification is a hostile and oppressive discrimination against particular persons and classes. . . .*" (Emphasis added.)

*See also Becker v. Levitt*, 489 F. 2d 1087 (2d Cir. 1973).

Moreover, appellants are not aided by the cases on which they rely: *County Commissioners of Carroll County v. Mayor and Common Council of Westminster*, 123 Md. 198, 91 A. 412 (1914) and the so-called Laurel cases, *County Commissioners of Prince George's County v. Commissioners of Laurel*, 51 Md. 457 (1879) (Laurel I) and *The County Commissioners of Prince George's County v. Commissioners of Laurel*, 70 Md. 443 (1889) (Laurel II).

In these cases legislative enactments had authorized tax

132

adjustments from the County to the Municipality located within the County. In Laurel I, an act of the General Assembly of Maryland directed that taxes levied for road purposes on real estate in the Town of Laurel were to be paid to the Commissioners of the Town for the purpose of road improvements within the corporate limits. The Court of Appeals held that there was no infringement upon Article 15 of the Bill of Rights because the statute, the Court found, merely applied the road tax to roads in which the entire public had an interest although located within the limits of Laurel. (The law was, however, held to be repugnant to a subsequent statute which introduced a new policy with respect to the public roads of Prince George's County.)

In Laurel II, the Court was confronted with a statute "more sweeping in its operation" and presenting a different question. This statute took not only the road tax but *all* taxes levied on real estate in the Town of Laurel and applied them not solely to the roads, as was done by the Act involved in Laurel I, but to any other desirable improvements in the Town which the Town Commissioners might decide proper. The Court of Appeals held the enactment unconstitutional, under Article 15 of the Bill of Rights, saying:

> "It is too plain for argument that such legislation cannot be sustained. It is practically exempting the owners of real estate in Laurel from contribution *pro tanto* to the necessary expenses of the county government. If it be competent to take the taxes levied upon the real estate in the town for such purposes, all taxes levied on the personal property within the town limits could be taken for the same object, and thus the citizens of Laurel would, in fact, be relieved from contributing a farthing to the support of the county government; and the whole county expenses would be thrown on those who live in the rural districts; and the rural districts would be indirectly supporting a corporation which gave them no protection or advantages. . . . *it is too plain for discussion, that the citizens of the town are relieved from sharing the expenses of the county,*

*while enjoying all the benefits of county government. This is in plain violation of Art. 15, of the Bill of Rights."* (Emphasis added.)

The *Carroll County* case, *supra,* held that an Act of the General Assembly was not in violation of Article 15 of the Bill of Rights in providing that it was the duty of the County Commissioners of Carroll County to pay annually to the Mayor and Common Council of Westminster one-half the amount of taxes levied and collected annually by the County for road purposes upon property within the limits of the City, to be used by the City for the repair, maintenance and improvements of City streets and roads. The question posed, the Court pointed out, was whether the Legislature could lawfully direct the application of money raised by taxation upon property within the corporate limits to defray certain specific expenses within the same limits. The Court cited with approval the case of *Board of Supervisors v. The City of Springfield,* 63 Ill. 66 (1872), in which it was held that the revenues of a County are not the property of a County in the sense in which the revenue of a private corporation is regarded, that the power of the Legislature in regard to them is plenary, and that an act providing for an apportionment between a County and a City of tax monies does not contravene a constitutional provision with regard to equal and uniform taxation.

Thus it is plain that these cases would tend to support the proposition that a legislative enactment providing for a property tax rate differential for municipal residents would not offend Article 15 of the Declaration of Rights so long as it did not relieve the City property owners of *all* tax liability for county services. This, however, is far from sustaining appellants' claim that Article 15, under the circumstances of this case, *requires* a County to remit to a municipal corporation within its boundaries a portion of the proceeds of the County ad valorem tax collected within the confines of the municipality.

Appellants' reliance upon certain legislative enactments of the General Assembly of Maryland prior to the adoption of

the Anne Arundel County Charter in 1964, as well as the provisions of the charter itself, is similarly misplaced. Appellants cite, for example, the provisions of Chapter 251, Public Local Laws, 1949, whereby the Legislature authorized and empowered the County Commissioners to appropriate funds for fire protection purposes in each of the Election Districts of Anne Arundel County and provided that the tax levied in Annapolis was to be paid to the City for distribution to volunteer fire companies; Chapter 717 of the Public Local Laws, 1953, which authorized the County to levy a special restriction tax, but provided that such levy would not apply to the Sixth Election District, the City of Annapolis; Chapter 717, Public Local Laws, 1953, which excepted Annapolis from legislation authorizing the Commissioners to set up garbage zones; Chapter 790, Public Local Laws, 1959, which empowered the County Commissioners to borrow funds for construction and improvement of roads and to issue and sell bonds to be funded by tax levy upon each of the eight special taxing districts corresponding to the established election district, but excepting the City of Annapolis from its provisions.

These statutes are inapposite. The issues in the present case do not concern legislative authority to create special use or taxing districts wherein the proceeds from the special taxes can be expended only in the district in which they are collected.

Finally, the applicable provisions of Section 718 of the Charter of Anne Arundel County supply no strength to appellants' position. The specific language to which appellants appear to advert is the following sentence from Section 718 b relating to "General Revenue and Receipts and Appropriations:

"A tax imposed upon all assessable property or class of property in the County *which exempts assessable property in an incorporated municipality subject to the provisions of Article XI-E of the State Constitution* shall not be deemed or construed to be a 'special tax' for the purposes of this section

and all receipts from such tax shall be paid into and appropriated from the general fund." (Emphasis added.)

And also the provisions of subsection d relating to levies for roads:

"No tax for the purpose of raising revenue for the construction and maintenance of public roads shall be levied upon any assessable property in the County except on a Countywide basis, *exclusive of incorporated municipalities subject to the provisions of Article XI-E of the State Constitution which operate and maintain their own road or street system.*" (Emphasis added.)

Again, this is at best a recognition of the propriety of enactments extending special tax treatment to incorporated towns and cities but to hold that such special treatment is mandated would be indeed a tortured and wholly improper interpretation.

We note the rather novel argument advanced for the first time in appellants' reply brief that the appellants' real complaint is not that there is a violation of the uniformity requirements of Article 15 of the Declaration of Rights but, rather, a violation of Article 11A of the Maryland Constitution which provided for chartered counties. Appellants argue that Article 11A, Section 3, expressly prohibits the County from enacting laws or regulations for any incorporated municipalities . . . "on any matter covered . . . by the Act incorporating it, or any subsequent Act or Acts amendatory thereto" ; that Section 44 of the City Charter empowers the City to provide by Ordinance "for the levying and collection, without limitation, upon all property within the present or future limits . . . of ad valorem taxes . . . necessary to meet its obligations. . . ." The adoption of a tax levy by the County, it is contended, constitutes the enactment of a law and, the syllogism runs, when the levy includes a charge to the property owners for municipal services to be expended outside the City similar to

those provided by the City, the levy is an unconstitutional enactment in violation of the above prohibition contained in Article 11A.

We think that the decision of the Court of Appeals in *Schneider v. Lansdale*, 191 Md. 317, 61 A. 2d 671 (1948) undermines appellants' contentions. In *Schneider* the Court had before it for decision the question whether the adoption by the County of a budget and the enactment of appropriations and tax levy measures constituted "legislation" within the meaning of Section 3 of Article 11A which required that all legislation must be enacted within one month during the year. The case involved the proposed Charter for Montgomery County, scheduled for submission to the voters in the November 1948 General Election. Article 2, Section 3 of the proposed Charter provided that the County Council should sit in Legislative Session during May of each year. Other provisions required public hearings on the expense budget between June 10th and June 15th, the adoption of the budget and the passage of a resolution appropriating the necessary amount, *after* such hearings and not later than June 30th. The lower court had held that these latter provisions concerned the enactment of legislation and since such legislation had to be enacted after the month of May, the budget and tax sections violated the provisions of Article 11A, Section 3 and were unconstitutional.[10]

Chief Judge Marbury in a lengthy historical analysis of the exercise of the taxing power in Maryland concluded that the power of fixing County expenditures and raising money to defray them was not a new power conferred upon the counties by Article 11A but, on the contrary, was a power always previously exercised by an appropriate agency in every county and was not "legislation" in the ordinary acceptation of the term. Judge Marbury concluded for the Court:

---

10. It was held, however, that these provisions were not so inseparable from the remainder of the Charter as to prevent the submission of the other part to the voters. Art. XI-A was amended in 1956 (1955, Ch. 557, ratified Nov. 6, 1956) to extend the legislative sessions to forty-five days "which may but need not be consecutive."

"It would give a strained and unnatural meaning to the word to hold that it included such activities of the Council as the adjustment of the fiscal affairs of the county even if these activities included the appropriation of money by resolution. What those who drafted the amendment were trying to do was not to restrict county authorities in these duties long exercised by them. The restrictions were intended to apply to the exercise of the power of local legislation, whether such exercise was by an enactment called a 'law' or by one termed an 'ordinance'. The nomenclature used does not change this obvious intention, nor does it lead us to any other conclusion in the interpretation of the constitutional provision. *We do not think the budget and levy making power is affected by the proviso in Section 3, and we hold that the budget and the appropriation and the tax levy are none of them 'legislation' as the word is used in that proviso.*" (Emphasis added.)

For the reasons above outlined, we conclude that the chancellor's disposition of the petition before him must be affirmed. We note, however, that the opinion of the Court contains an order that plaintiff's petition is "dismissed." For the reasons which we have set out in *Urbana Civic Association, Inc. v. The Frederick County Board of County Commissioners, et al.,* 23 Md. App. 49, 325 A. 2d 755 (1974), it was proper for the chancellor to dispose of the petition for declaratory judgment as on a motion for summary judgment. Nonetheless, as explained in *Urbana,* the correct judicial procedure is to make a written declaration of the rights of the petitioners who seek a declaratory judgment. This the chancellor accomplished in the well-considered written opinion to which we have referred. It was technical error, therefore, then to order that the petition be dismissed, an error which we find possible to correct by a modification of the final Order to state that summary judgment is granted to the appellees.

Because none of the appellants is entitled to the relief denied by the trial court, we do not reach the subsidiary question of their entitlement to a class suit. *See, Borden v. Director State Department of Assessments and Taxation, et al.,* 19 Md. App. 112, 309 A. 2d 773 (1973).

We are constrained to observe, in affirming the chancellor's action, that fundamental considerations of fairness indicate that the City of Annapolis — and perhaps other municipalities throughout Maryland — may be entitled to more equitable tax treatment by the counties than they receive. That the problem of County and Municipal fiscal relationships *is* susceptible of local legislative adjustment appears to have been demonstrated by the action in 1972 of the County Council for Prince George's County, to which we have referred. We have found that appellants in this case are without a judicial remedy; but even if their cause were amenable to judicial intervention, the very nature of the problems involved in adjusting City-County taxation, with their complex economic and policy considerations, argues persuasively for legislative rather than judicial action.

> *Judgment modified and as modified affirmed; costs to be equally divided.*