ISIDORE GORDON PREISSMAN *v.* BOARD
OF APPEALS,
MARYLAND DEPARTMENT OF EMPLOYMENT
SECURITY

[No. 537, September Term, 1975.]

*Decided March 29, 1976.*

The cause was argued before MORTON, MOORE and MELVIN, JJ.

*Isidore Gordon Preissman* in proper person.

*Diana G. Motz, Assistant Attorney General,* with whom was *Francis B. Burch, Attorney General,* on the brief, for appellee.

MOORE, J., delivered the opinion of the Court.

Appellant, Isidore Gordon Preissman, a member of the Bar, is also engaged in business in Baltimore City. In his capacity as an employer, he challenges the constitutionality of the provisions of the Maryland Unemployment Insurance Law whereby his experience-rating was charged with benefits paid to a former employee who had not been laid off but had resigned. Specifically, appellant contends that the Unemployment Insurance Law, Annot. Code of Maryland, Article 95A, § 8 (c) (2) (1975 Cum. Supp.), which permits the charging of unemployment compensation benefits to the experience-rating account of an employer even where the employee left his service voluntarily and without a cause attributable to the employer, is violative of the Due Process and Equal Protection clauses of the Fourteenth Amendment, and of Article 23 of the Maryland Declaration of Rights and Article III, § 40 of the Constitution of Maryland.

I

William Thompson, employed by appellant in maintenance work, quit his employment on August 29, 1972. He was at that point disqualified for employment insurance benefits under Article 95A, § 6 which provides:

"An individual shall be disqualified for benefits —

(a) *Voluntarily leaving work. — For the week in which his unemployment is due to his leaving work voluntarily without good cause, if so found by the Executive Director and for not less than the one nor*

*more than nine weeks which immediately follow
such week as determined by the Executive Director
in each case or until he has become reemployed and
has earnings therein equal to at least ten (10) times
his weekly benefit amount.* "(Emphasis added.)

During the next several months, however, Mr. Thompson
worked for three different employers and earned "at least
ten (10) times his weekly benefit amount," as the latter term
is defined in Article 95A, § 3. In June 1973 he lost his third
job and then made application for unemployment insurance
benefits. In the determination of such benefits, the
Unemployment Insurance Law prescribes, *inter alia,* a "base
period" which is defined in § 20 (a) as "the first four of
the last five completed calendar quarters immediately
preceding" the effective date of the claim for benefits.

Appellant was, by definition, one of Mr. Thompson's base
period employers and in June 1973 he received from the
Maryland Employment Security Administration a form
requesting separation information with respect to Mr.
Thompson. He returned the form with the notation "subject
resigned August 29, 1972."

Thereafter, the former employee received employment
insurance benefits for the period June 9, 1973 to October 13,
1973 in the amount of $1,430. Under the Unemployment
Insurance Law, benefits thus paid are required to be charged
under a percentage formula against employers' expe-
rience-rating records. Article 95A, § 8 (c) (2). Where an
employee has more than one employer during the base
period and no single employer paid 75 percent or more of his
wages during that period, the statute provides that the
benefits paid must be charged on a *pro rata* basis against *all*
base period employers. This requirement is imposed by § 8
(c) (2), *supra,* which provides:

"If the claimant earned 75 percent or more of his
base period wages from the principal base period
employer, all regular benefits and one half of any
extended benefits paid to such individual shall be
charged against the experience-rating record of his

principal base period employer (as defined in paragraph (9) of this subsection). *If the claimant earned less than 75 percent of his base period wages from the principal base period employer, all regular benefits and one half of any extended benefits paid to such individuals shall be charged on a pro rata basis to all base period employers.* The percentage of the charge to each base period employer shall be in the same proportion as the amount of wages paid to the claimant by each such employer is to the total amount of wages received by the claimant during the base period, and shall be computed as a whole number without decimals." (Emphasis added.)

Since none of Mr. Thompson's four (4) base period employers paid as much as 75 percent of his wages, the experience-rating records of all — including that of appellant — were charged. Appellant was assessed 29 percent of the benefits and this resulted in an increase, the percentage of which is not disclosed in the record, in his annual rate of contribution under the "Table of Basic Rates" prescribed by Article 95A, § 8 (c) (4) (ii).

Appellant protested the action of the Department in charging Thompson's benefits to his experience-rating record and was granted a hearing before a Hearing Officer for the Executive Director of the Department of Employment and Social Services on February 6, 1974. The Executive Director of the Department, James N. Phillips, made a determination as of February 13, 1974 that the benefits paid to the claimant Thompson were properly chargeable to the appellant's experience-rating account. Appellant then appealed the decision of the Executive Director to the Board of Appeals of the Department. Art. 95A, § 7 (f). The Board conducted a hearing on November 29, 1974 and affirmed the decision of the Executive Director.

Mr. Preissman thereupon sought judicial review of the decision of the Board of Appeals pursuant to Article 95A, § 7 (h), and the matter came before the Superior Court of

Baltimore City (Liss, J.) on April 25, 1975. As he had before the Department, appellant raised before the court the issue of the constitutionality of the Unemployment Insurance Law. In an oral opinion from the bench, followed by a formal order entered on June 4, 1975, the Court refused to declare the statute unconstitutional and affirmed the decision of the Board, finding that the benefits paid to Mr. Thompson were properly chargeable to Mr. Preissman's experience-rating account. Judge Liss stated, in part:

> "The Court finds the scheme devised by the Legislature in the 1964 amendment to be reasonable and clearly within its powers. It is not unreasonable or arbitrary or capricious, nor does it burden or deprive the employer of his property without due process."

From that decision, this appeal has been taken as we are also urged to hold the statute unconstitutional. For the reasons stated herein, we decline to do so.

## II

Under existing provisions of the Maryland Unemployment Insurance Law, as noted above, benefits paid to a claimant are automatically chargeable to the experience-rating account of all "base period" employers regardless of the reason for separation. No discretion is lodged in the office of the Executive Director to waive such charges. This has been the situation since June 1, 1964. The statute previously *permitted* the non-charging of an employer's experience-rating account when an individual left the employer's employment voluntarily, without good cause attributable to the employer, or for any reason that might disqualify him from receipt of benefits. In 1964, however, the General Assembly deleted a provision in what was then Article 95A, § 8 (c) (6) which stated that:

> "an employer's account shall not be charged with benefits paid . . . if [the claimant] left the service of the employer voluntarily without good cause

attributable to his employer. . . ." L. 1964, c. 25 at 62.

While counsel for appellee conceded at oral argument that some element of inequity exists as a result of the deletion by the General Assembly of the above provision, it was maintained that the inequity is not of constitutional dimension.[1] We agree.

The constitutionality of the statute in question here is clear. The Supreme Court considered a similar attack on the Alabama Unemployment Compensation Act in *Carmichael v. Southern Coal and Coke Co.*, 301 U. S. 495 (1937). There, Mr. Justice Stone, writing for the Court, said:

> "It is inherent in the exercise of the power to tax that a state be free to select the subjects of taxation and to grant exemptions. Neither due process nor equal protection imposes upon a state any rigid rule of equality of taxation. . . . This Court has repeatedly held that inequalities which result from a singling out of one particular class for taxation or exemption, infringe no constitutional limitation. [Citations omitted.]
>
> ". . . A legislature is not bound to tax every member of a class or none. It may make distinctions of degree having a rational basis, and when subjected to judicial scrutiny they must be presumed to rest on that basis if there is any conceivable state of facts which would support it. . . .
>
> "This restriction upon the judicial function, in passing on the constitutionality of statutes, is not

---

1. We are told that the above provision was deleted by the General Assembly at the instance of the Maryland Chamber of Commerce and that the Employment Security Administration opposed the deletion and has caused the introduction, at every Legislative Session since 1964, of a bill to return a "non-charging" provision. These proposals for a return to the prior law have been consistently defeated. *See,* House Bill 477, introduced January 29, 1975; House Bill 1129, introduced February 27, 1975; and Senate Bill 941, introduced March 3, 1975, none of which received even committee approval.

artificial or irrational. *A state legislature, in the enactment of laws, has the widest possible latitude within the limits of the Constitution. In the nature of the case it cannot record a complete catalogue of the considerations which move its members to enact laws. In the absence of such a record courts cannot assume that its action is capricious, or that, with its informed acquaintance with local conditions to which the legislation is to be applied, it was not aware of facts which afford reasonable basis for its action.* Only by faithful adherence to this guiding principle of judicial review of legislation is it possible to preserve to the legislative branch its rightful independence and its ability to function." 301 U. S. at 509-510. (Emphasis added.)

The Court in *Carmichael* found no constitutional infirmity in an unemployment insurance statute which, unlike Maryland's, made no provision for adjustments to employers' contribution rates based upon the frequency with which their unemployed workers received compensation. The following language strikes us as being particularly apposite here:

*"It is not a valid objection to the present tax, conforming in other respects to the Fourteenth Amendment, and devoted to a public purpose, that the benefits paid and the persons to whom they are paid are unrelated to the persons taxed and the amount of the tax which they pay — in short, that those who pay the tax may not have contributed to the unemployment and may not be benefited by the expenditure.* Appellees' contention that the statute is arbitrary, in so far as it fails to distinguish between the employer with a low unemployment experience and the employer with a high unemployment experience, rests upon the misconception that there must be such a relationship between the subject of the tax (the

exercise of the right to employ) and the evil to be met by the appropriation of the proceeds (unemployment). We have recently stated the applicable doctrine. 'But if the tax, *qua* tax, be good, as we hold it is, and the purpose specified be one which would sustain a subsequent and separate appropriation made out of the general funds of the Treasury, neither is made invalid by being bound to the other in the same act of legislation.' *Cincinnati Soap Co. v. United States, supra* [301 U. S. 308]. *Nothing is more familiar in taxation than the imposition of a tax upon a class or upon individuals who enjoy no direct benefit from its expenditure, and who are not responsible for the condition to be remedied.*

"*A tax is not an assessment of benefits. It is, as we have said, a means of distributing the burden of the cost of government.* The only benefit to which the taxpayer is constitutionally entitled is that derived from his enjoyment of the privileges of living in an organized society, established and safeguarded by the devotion of taxes to public purposes. See *Cincinnati Soap Co. v. United States, supra.* Any other view would preclude the levying of taxes except as they are used to compensate for the burden on those who pay them, and would involve the abandonment of the most fundamental principle of government — that it exists primarily to provide for the common good." (Emphasis added.) *Ibid.*, at 521-523.

The Court observed, with approval, that the State Legislature might have proceeded on the theory, "for which there is abundant authority," that the causes of unemployment are too complex to permit a "meticulous appraisal" of employer responsibility:

"*Even if a legislature should undertake, what the Constitution does not require, to place the burden of a tax for unemployment benefits upon those who*

*cause or contribute to unemployment, it might conclude that the burden cannot justly be apportioned among employers according to their unemployment experience.* Unemployment in the plant of one employer may be due to competition with another, within or without the state, whose factory is running to capacity; or to tariffs, inventions, changes in fashions or in market or business conditions, for which no employer is responsible, but which may stimulate the business of one and impair or even destroy that of another. Many believe that the responsibility for the business cycle, the chief cause of unemployment, cannot be apportioned to individual employers in accordance with their employment experience; that a business may be least responsible for the depression from which it suffers the most." (Emphasis added.) *Ibid.*, at 523, 524.

*Carmichael* provided support for the decision of the Court of Appeals in a leading Maryland case concerning the Unemployment Insurance Law, *Celanese Corp. of America v. Davis*, 186 Md. 463, 47 A. 2d 379 (1946). There the employer was asserting that a wartime change in contribution rates based upon total payroll in 1940 could not validly be applied to it because it was not a war industry and its payroll and number of employees were not increased as a result of the war. Judge Collins, quoting from the opinion of Mr. Justice Stone in *Carmichael*, rules that the legislature's attempt to secure funds for the unemployment it correctly believed would follow the war had a rational basis and was not susceptible to constitutional attack.

Recently, in *Griffin v. Anne Arundel County*, 25 Md. App. 115, 333 A. 2d 612 (1975), this Court quoted *Carmichael* to the effect that "[a] tax is not an assessment of benefits." There we upheld a county-wide tax which was attacked by Annapolis residents who felt that they were not being taxed proportionately with the benefits they received.

Although recognizing *Carmichael*, appellant argues that

the appellee "must first hurdle the obstacle in the form of the *basic* and *controlling* authority of *Railroad Retirement Board v. Alton Railroad Co.,* 295 U. S. 330 (1935)." (Emphasis added.) There, Mr. Justice Roberts, for a 5-4 majority, held the Railroad Retirement Act of 1934 to be unconstitutional as violating due process. The Act established a compulsory retirement and pension system for all carriers subject to the Interstate Commerce Act. The classes of persons eligible for annuities included those employed within one year prior to the passage of the Act whether or not such persons were or would ever again be employed. The Court held that the Act was not a legitimate exercise of the power to regulate interstate commerce and "denies due process of law by taking the property of one and bestowing it upon another." 295 U. S. at 350.

At its promulgation, the majority holding drew a vigorous dissent from the Chief Justice, Charles Evans Hughes, in which he was joined by Justices Brandeis, Stone and Cardozo. Within two years, the broad sweep toward judicial acceptance of legislative control over the marketplace became manifest.[2]

Since then, the vitality of *Alton Railroad* has become highly questionable. Mr. Justice Rutledge, in *Mandeville Island Farms, Inc. v. American Crystal Sugar Co.,* 334 U. S. 219, 230 (1948), included it in a list of cases "which the evolving nature of our industrialism foredoomed to reversal." In *Chew v. Quesada,* 182 F. Supp. 231, 232 (D.D.C.

---

2. N.L.R.B. v. Jones & Laughlin Steel Corp., 301 U. S. 1 (1937) is generally regarded as the landmark case after which legislation regulating the marketplace, both during and after the New Deal, has enjoyed an almost conclusive presumption at constitutionality. There Mr. Justice Roberts "changed sides" to create a 5-4 majority supporting the intervention of the N.L.R.B. in a labor dispute. In dissent Mr. Justice McReynolds prophetically referred to "the far-reaching import of [this] decision [and] the departure from what we understand has been consistently ruled here . . . ." 301 U. S. at 76. As stated by Judge Gibbons, in Frank Irey, Jr., Inc. v. Occupational Safety & Health Review Commission, 519 F. 2d 1200, 1224 (3d Cir. 1975) (dissenting on 7th Amendment grounds from enforcement of an administrative penalty), "The decision in *Jones & Laughlin* ... marked at least the beginning of the end of the Court's attempt to impose its subjective economic views on the nation in the guise of substantive due process."

1960), Judge Youngdahl stated flatly that "[t]he evidence is overwhelming that *Alton* is no longer controlling law." He quoted Dowling, *Cases on Constitutional Law*, 284, n.1 (5th ed. 1954) as saying that *United States v. Lowden*, 308 U. S. 225 (1939), shows that Chief Justice Hughes' dissent in *Alton Railroad* "has since been accepted as the view of the Court." He also quoted Mr. Justice Stone, *Lowden's* author, as saying that "it serve[s] both as a footnote and a headstone for *[Alton Railroad]*." In *Condor Operating Co. v. Sawhill*, 514 F. 2d 351, 361 (Temp. Emer. Ct. of Appeals 1975), Judge Christensen characterized *Alton Railroad* as having "been questioned as being at variance with the tenor of modern authority." Thus it is clear that while it has never been explicitly overruled, *Alton Railroad* is a case of little or no precedential value today. *Cf. Plessy v. Ferguson*, 163 U. S. 537 (1896).

On the other hand, *Carmichael* is clearly a landmark case on the question of the constitutionality of a State unemployment insurance law and has been quoted, cited and relied upon in Maryland. The Alabama statute, which was at issue in *Carmichael*, is comparable to the Maryland Unemployment Insurance Law. The Alabama statute set different rates during different time periods and there was no provision for non-charging an employer if he did not cause a particular claimant's employment; neither was any allowance made at all for an employer's experience-rating. Significantly, the constitutional challenge here is almost identical to that in *Carmichael*. As noted above, the employer there maintained that the tax was unconstitutional because the benefits were paid to persons "unrelated to the persons taxed and the amount of the tax which they pay — in short, that those who pay the tax may not have contributed to the unemployment and may not be benefited by the expenditure." 301 U. S. at 521. This is also appellant's argument here and we must reject it. That the Maryland General Assembly had a legitimate purpose in enacting the 1964 amendment is more than a presumption. Judge Liss, in his oral opinion, found two such purposes:

"The first was to insure the integrity and

maintenance of the funds from which un-
employment insurance benefits are paid. The
second was to spread the charges against the
experience rating to all employers in a base period."

*Judgment affirmed; appellant to
pay the costs.*